STATE of Iowa, Appellee,

v.

Rick Wayne FORSYTH, Appellant.

No. 94–1152.

Court of Appeals of Iowa.

Feb. 28, 1996.

Linda Del Gallo, State Appellate Defender, and Sharon R. Stevens, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich and Harold Young, Assistant Attorneys General, and Kevin Parker, County Attorney, for appellee.

Heard by HABHAB, P.J., and CADY, J., and McCartney, Senior Judge.*

HABHAB, Presiding Judge.

Defendant Rick Forsyth appeals from the judgment and sentences entered following his convictions on six counts of first-degree murder. He challenges (1) the sufficiency of the evidence to support the convictions; (2) the trial court's finding he was competent to stand trial; (3) the admission of his wife's journal into evidence; and (4) the exclusion of evidence regarding his wife's relationship with her brother, Kevin Rinehart. Following a careful review of each issue, we affirm.

■ **I. Sufficiency of the Evidence.** Defendant argues the State failed to prove beyond a reasonable doubt he committed first-degree murder. When reviewing criminal convictions for sufficiency of the evidence, we review the evidence in a light most favorable to the State. *State v. McGrew,* 515 N.W.2d 36, 37 (Iowa 1994). A conviction is reversed only if there is no substantial evidence in the record supporting the verdict or the verdict is clearly against the weight of the evidence. *Id.* at 37–38. Substantial evidence is evidence that could convince a rational trier of fact the defendant is guilty of the crime charged beyond a reasonable doubt. *Id.* at 38. A fair inference of guilt with respect to each element of the crime charged is sufficient to uphold a verdict. *Id.* We consider all of the evidence, not merely that supportive of the conviction, in determining the sufficiency of the evidence to support a guilty verdict. *State v. Robinson,* 288 N.W.2d 337, 340 (Iowa 1980).

Defendant was married to Jolene Forsyth. Jolene had filed a dissolution action in early 1992. The parties were separated and Jolene had obtained a restraining order against defendant. Defendant and Jolene had four children. Brian, Nikki and Jessica resided with Jolene in the family home in Norwalk, Iowa. The parties' fourth child, Eric, had died in 1990 following a bicycle accident. The evidence at trial indicated defendant had not coped well with Eric's death and behaved

* Senior judge from the Second Judicial District serving on this court by order of the Iowa Supreme Court.

obsessively with respect to the family's preservation of Eric's memory.

Martina and Helen Napodano were the daughters of Mark Napodano, the man Jolene was dating in June 1993. Since their father had an early appointment scheduled for the next day, Martina and Helen spent the night of Sunday, June 13, 1993, in Jolene's care. At approximately 12:30 p.m. on Monday, June 14, 1993, Jolene's brother, Kevin Rinehart, entered the Forsyth home and found the bodies of Jolene, Brian, Nikki and Jessica lying in the bed of the master bedroom. Jolene and Brian had been shot to death. Nikki had been strangled and Jessica had been suffocated. Forensic evidence suggested the family members had been killed in other rooms of the home and had been placed in the master bedroom after their deaths. Defendant was also found in the master bedroom suffering from gunshot wounds to the head and wrist. The Napodano girls had been shot to death and were found in a downstairs bedroom.

There was considerable evidence to establish defendant was resisting his wife's efforts to obtain a divorce and had threatened his family's safety. Defendant had told his wife's first dissolution attorney a divorce would not happen and he would do whatever he could to stop it from happening. Defendant told one of his wife's sisters in early 1992 that if he could not have the family no one else could. In February 1993, Jolene's sister-in-law, Cindy Rinehart, overheard a telephone conversation defendant had with his daughter Nikki. During the conversation defendant told his daughter it would never be over, and if the family tried running, he would kill all of them. In March 1993, Jolene's brother John overheard defendant tell Jolene "[y]ou are bringing this all on yourself. If you don't quit, I will kill you and the others." Also in March 1993, defendant told Jessica's former teacher he would kill Jolene and the children before there would be a divorce.

There was a great deal of evidence to establish defendant had stalked Jolene and the children. Relatives and neighbors testified as to defendant's relentless efforts to follow Jolene and the children and monitor their actions. Numerous times a day defendant would drive by and/or sit outside Jolene's home and observe her activities. In September 1992, the police apprehended defendant when he was prowling around Jolene's home. Testimony established defendant had engaged in stalking-type conduct from at least early 1992 through Saturday, June 12, 1993, when defendant followed his family and the Napodanos as they went to Des Moines for dinner.

From approximately January 1993 until the time of the murders, defendant had called Jolene's sister-in-law, Diana Rinehart, on a daily basis and discussed Jolene, the children, and the divorce proceedings. Diana testified that within a week or so before the murders, defendant's calls became more frequent and he was more upset. She characterized defendant as "obsessed" and said he was distraught over the fact Jolene had a male friend and was dating.

During the month preceding and the month following the murders, defendant was involved in, and was scheduled to be involved in, numerous legal proceedings. Defendant had been found in contempt of court on May 6, 1993, for entering his wife's property on two occasions in violation of the restraining order. As punishment for this contempt, defendant was ordered to serve fourteen days in jail by August 1, 1993. Defendant was apparently despondent over being ordered to serve jail time, as he appeared depressed to his landlord and indicated to him he did not think he could handle going to jail. Defendant had also been charged with harassment for making numerous hang-up phone calls to Jolene in April 1993, and he was scheduled to appear for trial on that charge on June 28, 1993. In addition to the May contempt trial and the June phone harassment trial, the Forsyth's dissolution trial was to be held in July 1993.

Following the murders, two apparent suicide notes were found, one in the rented room where defendant lived and the other in the Forsyth home. A handwriting expert testified the handwriting on each note was that of defendant. The note found in defendant's rented room repeatedly expressed his desire to stop all of the pain and save his

family so they could be together. The note references his son Eric's death and defendant's wish to "save all of us after Eric's death" so there would be "no more pain." At one point the note expresses an apology ("I'am (sic) sorry") but "I have to have *my family* " (emphasis in original).

The second note, found at the scene of the murders, also mentioned Eric and includes four references the family will now be together forever. This note also contains an apology and an apparent request for God to forgive defendant for the deaths of the two Napodano girls. At the conclusion of this note was a list of people and phone numbers, presumably individuals whom defendant thought should be contacted when the bodies were discovered.

Defendant claims the State failed to prove he was the perpetrator of the crimes, and he argues the physical evidence shows he could not have committed the murders. He suggests Kevin Rinehart, Mark Napodano, or other unnamed individuals committed the crimes. Defendant points to numerous complicated aspects of the evidence in his effort to challenge its sufficiency. For example, defendant gives considerable weight to the fact no blood was apparently found on Jessica's hair. Jessica's head was found upon a pillow which was covered by defendant's blood. Expert evidence indicated the blood most likely came from the gunshot wound to defendant's head. Defendant argues the only way Jessica's head could not have his blood upon it is if she were placed on the pillow after the blood had dried. Since expert testimony indicated it was unlikely defendant could have moved after his head wound was inflicted, defendant argues it is apparent someone else committed the murders and moved Jessica's body to the master bedroom.

The State's expert offered an opinion as to why there might have been no blood on Jessica's hair. He testified about the possibility of absorption into the pillow and the streaming of blood into crevices away from Jessica's head. Aside from this explanation, the absence of blood could have been explained by the jury simply finding the crime scene photographer was mistaken when he said he saw no blood on Jessica's hair. *See State v. Phanhsouvanh,* 494 N.W.2d 219, 223 (Iowa 1992) (resolving conflicts in the evidence is for the jury and the jury could believe all, some, or none of the testimony of the witnesses). In either case, the purported absence of blood on Jessica's hair does not undermine the sufficiency of the evidence to support the convictions.

In challenging the sufficiency of the evidence, defendant emphasizes the alleged presence outside the upstairs bathroom at the Forsyth house of a blood type which did not match any of the victims, the defendant, Mr. Napodano, or Mr. Rinehart. There was evidence the blood sample was very saturated and had the smell of urine. The jury may have disregarded evidence of this blood sample by concluding it was so contaminated as not to be significant.

Defendant raises a concern about the absence of a blood trail between the bed in the master bedroom and his blood-stained jeans, which were lying on the floor in the bedroom. He contends the absence of a blood trail is evidence someone else (the actual murderer or murderers) removed his jeans from him after he was shot in the head. This argument presumes the blood found on defendant's jeans could only have come from his head wound. Defendant was also shot in the wrist and bleeding from that wound could explain the presence of blood on his jeans. The absence of a blood trail between the bed and the jeans is consistent with defendant's removal of his jeans prior to his infliction of the head wound.

Defendant also raises a concern about the absence of blood trails given the number of bodies which were moved throughout the house. However, there was evidence of a heavily blood-stained pillow in the master bedroom which was theorized to have been used by defendant to transport the bodies. The jury could have found such use of the pillow would explain the absence of blood trails which would otherwise have been expected under the circumstances of this case.

Defendant argues the use of gloves and attempts to clean up the blood evidence are not consistent with the State's theory he

contemplated suicide. However, the record reveals defendant had a low-functioning I.Q. He was clearly unstable and his efforts to conceal some of the evidence at the crime scene are not necessarily inconsistent with his otherwise irrational behavior.

Defendant makes an issue of the fact Martina Napodano was found wearing both her father's and mother's clothes. Defendant offered testimony from the Napodano girls' mother, Page Brady, of threats Mr. Napodano had allegedly made to his daughters' safety. There was considerable evidence to establish the dissolution of the Napodano marriage had been quite bitter, and the jury was free to disregard Ms. Brady's accusations as those of an angry and hostile ex-spouse. The jury could further have found it not unusual a nine-year-old child might have secreted away some of her parents' clothing in order that she might wear it when she was traveling away from home.

Defendant also points to a phone conversation Page Brady had with Mark Napodano as evidence Mr. Napodano committed the murder. A transcript of the conversation reveals Ms. Brady blamed Mr. Napodano for placing the girls in a dangerous situation. The jury could reasonably have found Mr. Napodano's responses to his wife's accusations do not amount to an admission of guilt but were the sarcastic statements of a father who was tired of being berated about the deaths of his daughters.

In his effort to challenge the sufficiency of the evidence, defendant focuses on the statements and testimony of Kevin Rinehart. Mr. Rinehart, Jolene's brother, discovered the bodies and gave conflicting statements about what occurred when he found defendant in the master bedroom. At one point, Mr. Rinehart believed he and defendant struggled, defendant shot him, and he shot defendant in the head. Other testimony from a witness at the scene and the physical evidence do not substantiate this claim.

It was the jury's function to determine credibility and resolve conflicts in the evidence. The jury could have found the trauma of finding his sister and her family dead affected Mr. Rinehart's perception of what occurred. Nothing in Mr. Rinehart's testimony undermines the sufficiency of the evidence to support defendant's convictions.

Defendant's appellate counsel has done a commendable job of citing the evidence which is potentially exculpatory for defendant. We have reviewed all of the instances of evidentiary concern raised by defendant and find they were offset by countervailing evidence offered by the State. Any unresolved aspects of the evidence (such as the location of the pen used to write the suicide notes or the location of the key to defendant's rented room) are not sufficient to overcome the overwhelming evidence of defendant's guilt.

A review of the record establishes defendant had the motive to commit the murders and had stalked and threatened his family for months. Defendant was found at the scene with a gun in his possession, and he had gunpowder residue on his hands. A Norwalk police officer testified the gun looked like defendant's gun which the Norwalk police department had taken into custody during part of 1991. All nine of the empty casings found at the crime scene were fired from that gun.

The notes found in defendant's residence and at the crime scene strongly implicate defendant in the murders. They were written by him and reflect his desire to unify his family so they would be together forever with God in heaven. The note found at the Forsyth home reveals defendant's regret at having killed the two Napodano girls. Finally, the placement of Jolene and her three children in the master bedroom is symbolic of defendant's macabre obsession of reuniting his family at any cost. There was sufficient evidence to support the convictions.

■ **II. *Competency of Defendant.*** Prior to trial, defendant filed an application for a hearing to determine his competency to stand trial.[1] He argued he had sustained amnesia as a result of the gunshot wound to his head and was unable to appreciate the charges against him, understand the proceedings, or effectively assist in his defense.

---

1. Defendant renewed his competency claim in his motion for judgment of acquittal.

Pursuant to Iowa Code section 812.3, a competency hearing was held by the district court.[2] In its ruling, the district court found defendant was suffering from amnesia with respect to the events of June 13 through June 15, and the amnesia was probably permanent in nature. However, the court concluded defendant understood the charges and their consequences and was able to communicate with his counsel and assist in his defense. The district court found defendant competent and ordered him to stand trial.

■ The law presumes an accused is competent to stand trial. *State v. Martens*, 521 N.W.2d 768, 770 (Iowa App.1994). The burden to prove incompetency rests with the accused. *Id.* If the evidence is in equipoise, the presumption of competency prevails. *Id.* The conviction of an incompetent defendant is prohibited by the due process clause and contrary to the fundamental precept of a fair trial. *Id.* Our review is de novo and we consider the totality of the circumstances. *Id.*

■ Amnesia about events surrounding a charge does not automatically render a defendant incompetent to stand trial. *Id.* The test of competency to stand trial is whether the accused appreciates the charge, understands the proceedings, and can effectively assist in the defense. *Id.* Dr. Souza testified he had performed a psychiatric evaluation of defendant and found defendant was aware of his legal circumstances and had the ability to comprehend his current legal situation. Officer Hosey, an officer who guarded defendant while he was hospitalized, testified he heard defendant have a phone conversation with his father and defendant explained to his father he understood the State was attempting to make a case against him for killing his wife and children.

■ Upon our de novo review of the record, we conclude defendant appreciated the charges and understood the proceedings. We further find defendant could effectively assist in his defense despite his amnesia. Where most of the State's evidence is physical in nature, and defendant had access to the State's files, a defendant's amnesia does not necessarily render him incompetent to stand trial. *See State v. Emerson*, 375 N.W.2d 256, 261 (Iowa 1985). Defendant produced a vigorous defense and challenged the State's physical evidence. Defendant was able to impressively confront nearly every aspect of the State's case. We affirm the district court's finding defendant was able to effectively assist in his defense and was competent to stand trial.

■ **III.** *Admissibility of Journal.* Defendant claims the trial court erred in admitting Jolene's journal pursuant to the hearsay exception of Iowa Rule of Evidence 804(b)(5).[3] At the instruction of her dissolution attorney, Jolene had kept the journal to record incidents when defendant called, visited, or followed her and her family.

The hearsay exception provisions of Rule 804(b)(5) should apply only when there is significant indicia of reliability. *State v. Nance*, 533 N.W.2d 557, 559 (Iowa 1995). Admissibility of such hearsay requires findings of trustworthiness, materiality, necessity, notice, and service of the interests of justice. *See State v. Brown*, 341 N.W.2d 10, 14 (Iowa 1983).

■ We review the admission of hearsay evidence only for an abuse of discretion. *See State v. Maniccia*, 355 N.W.2d 256, 260 (Iowa

**2.** If at any stage of a criminal proceeding it reasonably appears that the defendant is suffering from a mental disorder which prevents the defendant from appreciating the charge, understanding the proceedings, or assisting effectively in the defense, further proceedings must be suspended and a hearing had upon that question.
Iowa Code § 812.3 (1993).

**3.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: ... A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence....
Iowa R.Evid. 804(b)(5).

App.1984). The parties strongly dispute the trustworthiness of Jolene's journals. The State argues records kept by a client pursuant to her attorney's direction are trustworthy and reliable. Defendant contends the journals were inherently untrustworthy as they were prepared in anticipation of litigation (the parties' divorce) and Jolene would have had a motive to lie about defendant's conduct in order to further her interests in the dissolution proceedings.

We need not resolve this question as we find, even if the journal was erroneously admitted, the error was harmless. When an alleged error is not of constitutional magnitude,

> the test of prejudice [for harmless error purposes] is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice.

State v. Traywick, 468 N.W.2d 452, 454–55 (Iowa 1991) (quoting State v. Massey, 275 N.W.2d 436, 439 (Iowa 1979)). A review of the journal reveals most of the entries therein were merely duplicative of testimony offered at trial by family members, neighbors, and law enforcement officials. The journals reflect the obsessive nature of defendant's calls to, and monitoring of, Jolene and her children. Admission of the journal did not prejudice defendant.

**IV. *Exclusion of Evidence.*** Defendant's final argument is the trial court erred in excluding evidence he wished to introduce regarding a purported motive Kevin Rinehart had to kill Jolene and her children and to be biased against defendant. Kevin and his wife, Diana, were involved in dissolution proceedings at the time of the murders, and the issue of custody of their children was in dispute. During the course of their dissolution proceedings, Kevin's wife had completed an affidavit in which she raised a concern about Kevin and Jolene's relationship. Mrs. Rinehart based her allegation on something Jessica Forsyth had allegedly told her father and which defendant had then repeated to Diana. Defendant contends an upcoming homestudy custody evaluation could have motivated Kevin to kill Jolene and her family so the allegation could not be verified and could not affect his chance of obtaining custody of his children. Defendant attempted to bolster his claim by offering evidence pertaining to therapy sessions Jolene had with a psychologist from 1985 until 1987. The trial court excluded all evidence pertaining to these matters.

Trial courts have considerable discretion in determining the admissibility of evidence and our review of the trial court's decision to exclude the evidence proffered by defendant is limited to an abuse of that discretion. *See* *State v. Oliver,* 341 N.W.2d 25, 32 (Iowa 1983). We have reviewed the evidence defendant wished to offer and find no abuse of discretion in its exclusion by the trial court. The evidence was unsubstantiated hearsay of a highly prejudicial nature with little relevance to the case. We affirm its exclusion.

**AFFIRMED.**