# IN THE COURT OF APPEALS OF IOWA

No. 20-0702
Filed April 14, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**JACOB SCHMITT,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Cerro Gordo County, Rustin T. Davenport, Judge.

A defendant appeals his conviction for burglary in the third degree. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Maria Ruhtenberg, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.

Considered by Bower, C.J., and Tabor and Ahlers, JJ.

**TABOR, Judge.**

A jury found Jacob Schmitt guilty of third-degree burglary. Schmitt contests the verdict, claiming the State offered insufficient proof that he did not have permission or authority to enter his friend's private bedroom or to remain in the house. Because substantial evidence supports the verdict on both alternatives of the burglary offense, we affirm.

## I. Facts and Prior Proceedings

Schmitt was friends with Brett Wetter and his wife, Angie. According to Wetter, they "tried to help each other whenever [they] could." For a while, Schmitt struggled to find housing. So Wetter allowed Schmitt to "spend the night off and on" at his place.[1] Likewise, Schmitt supported Wetter as he battled drug addiction.

On November 4, 2019, Wetter entered an inpatient substance-abuse program in Mason City. He planned to stay there for twenty-eight days. Schmitt drove Wetter to treatment after spending the night at his house. During their drive, Schmitt revealed his plan to move into his own apartment later that week. He told Wetter he was waiting for his paycheck on Friday before making the move. Wetter responded "that [Schmitt] was welcome to stay at [his] place" until then. Based on that conversation, Wetter and Schmitt agreed Schmitt could stay at Wetter's house until Friday but he could not have visitors or use drugs inside the house.

Before entering treatment, Wetter gave Schmitt the code to access his house. Although the code unlocked the "smart lock" on the main doors, Wetter had separately locked his bedroom door to secure his belongings while he was

---

[1] Angie used to live with Wetter, but she moved out in January 2019. They have lived separately ever since but remain married.

away. Wetter recalled there was no key to access his bedroom once it was locked. When the prosecutor asked how Wetter planned to unlock it, Wetter replied, "I was going to figure that out twenty-eight days later."

Angie went to Wetter's house the next day to recover some of her personal items. She recalled seeing Schmitt inside. When she walked downstairs, she noticed Wetter's bedroom door was "off the hinges." She also said the basement "looked like the beginning of a mess." Knowing Schmitt was staying there, Angie did not mention anything to Wetter.

On November 17, Angie visited Wetter at the treatment center. Wetter asked if she could bring his winter coat from the house. Angie agreed. She testified that neither of them expected anyone to be at the house. But when Angie arrived, she saw "a car out front and [Schmitt] coming to the door." After exchanging a few words with Schmitt, Angie went downstairs only to encounter two more people. As Angie described, "It looked like they were partying down there" and "[the basement] smelled like alcohol, trash, [and] food." She also noted Wetter's bedroom was "in disarray" and "looked like it had been lived in."

Angie called Wetter to confront him about the situation. She assumed Wetter knew that people were partying there. In her words: "I didn't understand why he would let that go on in our house." But according to Wetter, he was in the dark before Angie called. So Wetter accessed security cameras inside his house through an internet service. After seeing movement, Wetter contacted the police.

Several Mason City police officers went to investigate. The officers discovered that the doors and garage were locked, so they called Angie for

help.  She tried the access code, but the smart lock had been disabled.[2]  So she entered the house through an open window.  When she approached the front door to let officers in, she saw "[t]here was a bed frame up against [it]."  Once inside, Officer Cameron Theilen conducted a sweep of the entire residence.  He did not find anyone during his search.

Lieutenant Michael Lillquist did another walk-through with Angie, with Wetter on speakerphone.  This time around, they found Schmitt "sandwiched in between the mattress and the box spring" in the downstairs bedroom.  The lieutenant asked Schmitt if he had permission to be at the house.  Schmitt said "he thought that he had."  Schmitt denied hiding from the officers.

Officers Theilen and Mason McGrauth arrested Schmitt and searched him at the residence.  They removed items from his pockets, including credit cards, membership cards, a pocket knife, a wristband, and a handkerchief.  Schmitt admitted those items belonged to Wetter.[3]  Schmitt also was wearing Wetter's clothes, boots, and rings.  Schmitt explained to the officers "that [Wetter] wanted for him to keep his things safe; and that . . . the best way he knew how to keep his property safe, was to physically have them on his possession."

Before escorting Schmitt to the Cerro Gordo County Jail, the officers retrieved a backpack that Schmitt claimed was "full of his stuff."  Wetter later confirmed that most of the items inside belonged to him.[4]

---

[2] Wetter testified that the smart lock could be disabled by taking out the batteries.
[3] The cards had Wetter's name on them.
[4] At trial, Wetter identified several of his items in the backpack: an electric multi-meter, a smart watch, two tablet devices, Allen wrenches, and a multipurpose shovel.

The State charged Schmitt with third-degree burglary, a class "D" felony, in violation of Iowa Code sections 713.1 and 713.6A(1) (2019). The trial information alleged that Schmitt "did commit burglary by entering an occupied structure, without a right, license, or privilege to do so." At the start of trial, the State amended the information to add a "remaining over" alternative. After the State presented its case-in-chief, the defense moved for judgment of acquittal on both the "entering" and "remaining-over" theories. The district court denied the motion. The jury found Schmitt guilty as charged. Schmitt appeals.

## II. Scope and Standard of Review

We review sufficiency-of-the-evidence challenges for correction of legal error. *State v. Rooney*, 862 N.W.2d 367, 371 (Iowa 2015). We will uphold the verdict if substantial evidence supports it. *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017). Evidence is substantial if it could persuade a rational jury that the defendant is guilty beyond a reasonable doubt. *Id.* We view the evidence "in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (quoting *State v. Keopasaeuth*, 645 N.W.2d 637, 640 (Iowa 2002)). A conviction must rest on evidence that creates more than speculation, suspicion, or conjecture. *See State v. Webb*, 648 N.W.2d 72, 76 (Iowa 2002).

## III. Analysis

The State advanced both alternatives of third-degree burglary: "entering" the locked bedroom and "remaining-over" in the house. *See* Iowa Code § 713.1; *see also State v. Dible*, 538 N.W.2d 267, 271 (Iowa 1995) (discussing "remaining over" as continuous event).

For the "entering" theory, the State had to prove:

    1. On or about November 17, 2019, [Schmitt] entered the bedroom of Brett Wetter.
    2. The residence was an occupied structure.
    3. [Schmitt] did not have permission or authority to enter the bedroom.
    4. The residence was not open to the public.
[Schmitt] did so with the specific intent to commit a theft.

For the "remaining-over" theory, the State had to establish these elements:

    1. On or about November 17, 2019, [Schmitt] remained in the residence of Brett Wetter.
    2. The residence was an occupied structure.
    3. [Schmitt's] permission or authority to remain in the residence had ended.
    4. The residence was not open to the public.
    5. [Schmitt] did so with the specific intent to commit a theft.

Schmitt claims the State offered insufficient evidence to support his conviction on either alternative. Specifically, Schmitt argues the State failed to prove beyond a reasonable doubt that he did not have permission to enter Wetter's bedroom or remain in the house after November 8. We will address each contention in turn.[5]

**1. Entering**

Schmitt first contends the evidence did not show he lacked permission or authority to enter Wetter's bedroom. He argues because neither Wetter nor Angie prohibited him from going into the bedroom, it was "reasonable" for him to believe

---

[5] In doing so, we recognize the Iowa legislature enacted new legislation in 2019 that allows appellate courts to uphold a general verdict in cases where "the prosecution relies on multiple or alternative theories to prove the commission of a public offense" and at least one alternative "is sufficient to sustain the verdict on at least one count." *See* 2019 Iowa Acts ch. 140, § 32 (codified at Iowa Code § 814.28 (Supp. 2019)). We choose to address both alternatives in this appeal.

he had permission to do so. Schmitt points out that Angie said nothing to him or Wetter when "she saw [him] at the house and the door was off the hinges."

In rebuttal, the State claims "Schmitt could not reasonably have believed he had permission or authority to enter the locked bedroom." In its view, the fact that Wetter separately locked his bedroom door with his personal belongings in it showed his room was off-limits. The State also insists Angie's decision not to say anything about the unhinged door "is not relevant to the question of Schmitt's permission or authority to enter that room." We agree.

To start, Schmitt does not dispute that Wetter locked the downstairs bedroom before leaving for treatment. Nor does Schmitt challenge Angie's testimony that the bedroom door was later open and off its hinges when Schmitt was the only person staying at the house. Instead, Schmitt claims he held a reasonable belief that he had permission to enter the locked bedroom because no one told him otherwise.

But the "right, license, or privilege" element of burglary turns on whether the entry was made without consent. *See State v. Schoo*, No. 03-0999, 2004 WL 2173328, at *1 (Iowa Ct. App. Sept. 29, 2004) (noting lack of consent was sufficient to satisfy this element) (citing *State v. Franklin*, 368 N.W.2d 716, 718–19 (Iowa 1985)). The record lacks evidence that Schmitt had consent to enter Wetter's private bedroom. In fact, Wetter's conduct suggested he did not consent to anyone being in that room, let alone Schmitt. At trial, Wetter explained:

> I have my room in the basement, which is finished; and I had put my stuff in there and locked the door actually to my room. I have a separate lock for that door. So that was locked separately. And other than that, I left [the house] in—in [Schmitt's] care until he got his own place on Friday.

When the prosecutor asked who had the key to unlock his bedroom door, Wetter answered, "Nobody." Wetter added, "In fact, I don't even think that I had one. I just knew that it needed to be locked and my stuff was in there." The jury could reasonably infer from Wetter's testimony that he did not give Schmitt permission to enter his locked bedroom.[6]

Moreover, Schmitt's privilege to be in the home did not confer an automatic right to enter a secured bedroom. *See State v. Peck*, 539 N.W.2d 170, 173 (Iowa 1995) (noting a person "with the right to be in the building or room, may be convicted of burglary on proof that he broke and entered at a time or place beyond his authority"); *State v. Chambers*, 529 N.W.2d 617, 621 (Iowa Ct. App. 1994) (upholding burglary conviction where defendant entered office door with sign stating "Authorized Personnel Only" when building was otherwise open to the public). Because Wetter never gave Schmitt permission to enter the downstairs bedroom and took affirmative steps to obstruct access, reasonable jurors could conclude that Schmitt exceeded his general right of entry. *See State v. Brassell*, No. 13-1523, 2014 WL 3748319, at *2 (Iowa Ct. App. July 30, 2014) (holding that homeowner's permission to go into kitchen for drinks did not grant men right to enter victim's bedroom).

Our conclusion is bolstered by the fact that Schmitt had to remove the hinges to open the bedroom door. Based on that same evidence, the jury could

---

[6] As the State noted, whether Angie acquiesced to Schmitt's entry is irrelevant to this issue. Angie testified she no longer resided at the home and did not know the terms of her husband's agreement with Schmitt.

reject Schmitt's mistake-of-fact defense.[7]  Viewing the record in the light most favorable to the State, substantial evidence supports the finding that Schmitt did not have permission to enter Wetter's bedroom or possess a reasonable, good-faith belief to the contrary.

## 2. Remaining Over

Schmitt also claims the evidence was insufficient to show that he remained over after his permission to stay at Wetter's house had expired.  He argues "[he] was under the impression the entire time that he had permission to stay in the house while [Wetter] was in rehab."  To support his viewpoint, Schmitt emphasizes that Wetter never contacted the police or told him to leave "until [Angie] found out [he] was partying in the house."  We reject this contention.

The record does not support Schmitt's claim that he had permission to remain in Wetter's house for the duration of the treatment program.  Cutting against Schmitt's assertion is Wetter's testimony that his authorization had a clear end date.  Wetter recalled telling Schmitt that he could stay "until he got his place ready" because Schmitt promised he would "move into his own place on Friday when he got his second check from working."  According to Wetter, they agreed that Schmitt could stay at the house until Friday (November 8) as long as he did not use drugs or invite other people over.  Wetter also testified he didn't expect anyone to be at

---

[7] The court instructed the jury:

> [Schmitt] claimed that at the time of the act in question, he was acting under a mistake of fact as to if he had permission or authority to enter the bedroom or remain in the residence. When an act is committed because of mistake of fact, the mistake of fact must be because of a good faith, reasonable belief by [Schmitt] acting as a reasonably careful person under similar circumstances.

the house when he asked Angie to stop by on November 17. The only conflicting evidence was Schmitt's own statements to police that he thought he had permission because "he had spoken with [Wetter] a couple of days before . . . and [Wetter] had never mentioned that he couldn't be at the house." But the jury was free to believe Wetter's testimony and conclude Schmitt did not have permission to be at the house when police arrested him. *See State v. Forsyth*, 547 N.W.2d 833, 836 (Iowa Ct. App. 1996).

The State also presented evidence that Schmitt hid under a mattress when police searched the home. According to Officer Theilen's testimony, when they asked Schmitt why he was hiding, Schmitt responded "he did not know it was the police." But Officer Theilen confirmed they had announced their presence before entering every room, so Schmitt would have heard them. Likewise, the jury heard that a bedframe was lodged against the front door and that the smart lock had been disabled. When coupled with Schmitt's evasive behavior, the jury could reasonably infer that he was responsible for taking those actions.

Reviewing the record in the light most favorable to the verdict, we find substantial evidence that Schmitt remained in the house despite knowing he no longer had the right to be there. *See State v. Walker*, 600 N.W.2d 606, 609 (Iowa 1999) ("If the defendant remains on the premises after having reason to know he has no right to do so, he has 'remained over.'"). Thus, the evidence was sufficient to support the verdict on both the "entering" and "remaining-over" alternatives.

**AFFIRMED.**