THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MATTHEW FOLEY, Defendant-Appellant.

Second District    No. 2—98—0321

Opinion filed December 28, 2000.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Donna Hickstein-Foley, of Foley & Foley, of Chicago, for appellant.

Roger T. Russell, State's Attorney, of Belvidere (Martin P. Moltz and Peggy F.J. Bradford, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

After a jury trial the defendant, Matthew Foley, was found guilty of predatory criminal sexual assault (720 ILCS 5/12—14.1(a)(2)(A) (West 1996)), residential burglary (720 ILCS 5/19—3 (West 1996)), and home invasion (720 ILCS 5/12—11 (West 1996)). The defendant was sentenced to 25 years' imprisonment on the sexual assault count and

consecutive 10-year sentences for residential burglary and home invasion to run concurrently with each other. The defendant appealed, and we affirmed defendant's convictions in a Rule 23 order filed October 18, 1999. *People v. Foley*, No. 2—98—0321 (1999). Pursuant to an order by our supreme court, we vacate our prior Rule 23 order and reconsider this cause in light of *People v. Ramsey*, 192 Ill. 2d 154 (2000). We affirm.

The following facts are taken from the record. G.S., the complainant's grandmother, testified that, at about 7:30 a.m. on October 16, 1997, while at home, she attempted to make a phone call to get a ride for the complainant, K.S. However, the phone was dead, so G.S. went to the garage to use her car. As she walked toward her car, G.S. noticed that all four tires of her son's car were flat and that the phone lines had been cut. G.S. stated that the phone lines had been repaired that afternoon but were dead again that evening.

While looking out the window of the home that evening, E.W., G.S.'s son's fiancée, saw a man staring at the house. E.W. turned out the lights and got a hammer; when she looked again, the man was pacing outside the house. E.W. told G.S. that there was a prowler outside. G.S. looked outside and saw nothing. She went to bed at about 9:30 p.m.

G.S. stated that she shared a bed with her granddaughter, K.S., the complainant, who slept in the nude. At about 11:30 p.m., G.S. awoke when she heard her granddaughter ask in a frightened voice what was going on. G.S. saw a man she identified as the defendant with a knife to K.S.'s throat. When G.S. began to cover K.S. with a blanket, the defendant told G.S. to stop or he would cut K.S. The defendant told G.S. that she knew what he wanted. G.S. then jumped out of bed, turned on a light, ran to the bedroom door, and screamed for help. M.S., the grandmother's son and K.S.'s father, ran into the room and subdued the defendant. G.S. ran to a neighbor's house and called the police.

The complainant's father, M.S., testified that he lived with his mother, G.S., and his daughter, the complainant, K.S. On the morning of October 16, 1997, M.S. saw that his tires were slashed and the phone lines were cut. When he returned from work at 10:45 that evening, the lights were off in the house. His fiancée told him about the man she had seen earlier and what had happened with the phone lines that day. M.S. then saw that the phone lines had been ripped apart again.

M.S. also stated that, at about midnight, he heard his mother (G.S.) scream and he ran to her bedroom, where he saw the defendant holding a knife at his daughter's (K.S.'s) throat. The defendant's

pants were unzipped and his pants were down at his knees. M.S. knocked the defendant down, grabbed the knife, and held the defendant until the police arrived. Later, M.S. saw that the screen door had been cut.

Belvidere police officer Patrick Gardner, the first officer to arrive at the scene, testified that, when he arrived at the scene, the defendant's jeans were unzipped and down around his knees. The defendant was wearing a black stocking cap, a black leather jacket, and green jeans.

According to Officer Gardner, while still in the house, the defendant was advised of and waived his *Miranda* rights and stated that he grabbed K.S.'s "crotch" and "tits." Officer Gardner escorted the defendant to a patrol car and rode in the backseat of the car from the scene to the Belvidere public safety building. During the drive, the defendant made additional admissions. According to Gardner, the defendant stated that, on the morning of October 16, 1997, he looked through a window and saw K.S. naked. The defendant also stated that he wanted to have sex with K.S. and stalked the house throughout the day. The defendant also told Gardner that at around 10 p.m. he stacked 12 boards outside K.S.'s window and climbed them to peer through the window. The defendant stated that he was not able to enter the house through the window, so he cut the screen door and entered that way. The defendant told the officers that he went directly into K.S.'s room and placed a knife at her throat. K.S.'s grandmother, G.S., woke and turned on a light when K.S. began to struggle. The defendant told the grandmother that she knew what the defendant wanted and he then grabbed K.S.'s breast and "crotch." The defendant then stated that he placed his finger in K.S.'s vagina and knew that she was a virgin because "it smelled so good." According to Gardner, the defendant stated that K.S. seemed to be 14 or 15 years old and that he knew that it was wrong to commit these acts. The defendant also stated that he had consumed cocaine earlier that day.

Belvidere police officer David Dammon testified that he drove the defendant from the scene to the Belvidere public safety building at about 1 a.m. Dammon stated that the defendant stated that he knew he was in trouble and that he was not going to hurt the "bitch" and he just wanted to get some money to buy some "rock." According to Officer Dammon, the defendant did not appear to be under the influence of alcohol or drugs.

Belvidere police officer Daniel Smaha testified that he was present when the defendant, after again being advised of and again waiving his *Miranda* rights, gave an oral statement at the Belvidere public safety building. The statement was reduced to writing and signed by

the defendant. The defendant stated that, on the day of the incident, the defendant walked down K.S.'s street looking into windows, when he saw K.S., who was nude. The defendant thought that only two women lived in the house. He observed the house for awhile, cut the phone wires, left the area, and returned in the late evening hours. The defendant stated that, after the house lights were off for about an hour, he cut the screen door and entered the house. The defendant stated that he held a knife to K.S.'s throat with his right hand and put his left hand on K.S.'s breast. The grandmother turned the light on and asked what the defendant wanted. The defendant stated that the grandmother knew what he wanted and the grandmother began to yell for the police. The defendant also admitted that he stuck his index finger into K.S.'s vagina and that he intended on robbing the house and having sex with K.S. if no one else was there. The defendant stated that he was high when he broke into the house and had smoked five to six bags of crack cocaine earlier that day. But Smaha stated that the defendant did not appear to be under the influence at the time the defendant gave the oral statement.

Dr. Donald Pearson, a licensed clinical psychologist, testified on the defendant's behalf. Dr. Pearson stated that he examined the defendant for the first time on November 13, 1997. However, Dr. Pearson terminated that session after determining that the defendant had been overly sedated. Dr. Pearson examined the defendant again on November 18, 1997, and the defendant was alert, responsive, and unmedicated, but was also disheveled, unshaven, and wounded on both arms. Dr. Pearson described the wounds as rub and gouge marks. During this second exam, Dr. Pearson conducted 15 tests, which revealed that the defendant had aggressiveness and a possible psycho-organic disturbance and that the defendant was not malingering. The tests also revealed that the defendant suffered from extreme depression, deviant thoughts, periodic and high levels of anxiety, feelings of loneliness and estrangement, a high propensity for neurotic breakdown, and low-average intelligence.

Dr. Pearson also reviewed the defendant's mental health records from the Department of Corrections, which revealed that, while the defendant was previously incarcerated in 1996, two Menard staff psychiatrists diagnosed him with schizophrenia in May 1996. At that time, the defendant's symptoms included auditory hallucinations in the form of his late uncle speaking to him. The report also indicated that defendant was suicidal and, while on medication, burned and scratched himself and set his pants on fire in response to a hallucination in June 1996. The defendant's medical record indicated that the defendant's schizophrenia went into partial remission and his self-

destructive behavior decreased, but the defendant refused to take his medication.

The record also contained a June 1997 report by Dr. Angel Hereda, a Dixon staff psychiatrist. The defendant told Dr. Hereda that he had a history of auditory hallucinations, which were in remission at the time of the report; explosiveness; increased energy; racing thoughts; a decreased need for rest; and depression. Dr. Hereda and another Dixon staff psychiatrist diagnosed the defendant with bipolar disorder.

Dr. Pearson also stated that the defendant's mental health record revealed that, after the defendant was discharged from the Department of Corrections on September 16, 1997, he went to a mental health facility seeking help, saying he was suicidal. In response, the defendant was given medication, but he did not take it. Subsequently, the defendant left the facility and began abusing alcohol and cocaine. Three or four days after he left the mental health facility, he committed the acts that are the subject of this appeal.

Based on the examinations, tests, medical records, and police reports, Dr. Pearson opined that the defendant was insane at the time of the instant offenses. According to Dr. Pearson, the defendant's condition was affected by certain conditions that rendered his illness as either active or in remission. While the defendant's illness is active, he can cognitively acknowledge right and wrong but does not appreciate the criminality of his conduct and cannot conform his behavior to appropriate standards.

Dr. Robert Gordon, a licensed clinical psychologist, testified on behalf of the State. Dr. Gordon testified that he examined the defendant on December 4, 1997, administered intelligence and emotional problem tests, and reviewed the defendant's mental health records. Dr. Gordon opined that the defendant had the capacity to appreciate the criminality of his conduct. Dr. Gordon stated that the defendant had borderline intelligence, an alcohol and polydrug dependence in remission, antisocial personality disorder, and adjustment disorder with depressed mood. Dr. Gordon also opined that the defendant did not have a major psychiatric disorder and disputed the diagnosis of bipolar disorder. According to Dr. Gordon, the only disorder that could have affected the defendant's ability to appreciate the criminality of his conduct was borderline intelligence. However, the defendant's intelligence was not so low as to have a significant effect. Dr. Gordon recognized that the defendant had a detailed psychiatric history and that, during the time he was incarcerated from 1995 through 1997, psychiatrists submitted monthly reports on the defendant's mental health.

The defendant pleaded not guilty by reason of insanity. The jury

was instructed regarding the verdicts of not guilty by reason of insanity and guilty but mentally ill.

The trial court instructed the jury as to the then-current amended form of the insanity defense statute as contained in Public Act 89—404 (Pub. Act 89—404, § 15, eff. August 20, 1995), which amended section 6—2 of the Criminal Code of 1961 (720 ILCS 5/6—2 (West 1994)). The defendant's conviction came before our supreme court held that Public Act 89—404 was unconstitutional in its entirety because it violated the single subject rule. *People v. Reedy*, 186 Ill. 2d 1, 12 (1999). Because the amended form of the insanity defense, the version applied to the case at bar, was void *ab initio*, the insanity defense statute remained as it was before the adoption of Public Act 89—404, section 15. The preamended insanity defense statute, the version that should have been applied to the case at bar, provided in pertinent part:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either [1] to appreciate the criminality of his conduct or [2] to conform his conduct to the requirements of law.

\* \* \*

(e) When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by *a preponderance of the evidence* that the defendant is not guilty by reason of insanity." (Emphasis added.) 720 ILCS 5/6—2(a), (e) (West 1994).

The amended and now invalidated insanity defense statute, the version that was applied in this case, provided in pertinent part:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, *he lacks substantial capacity to appreciate the criminality of his conduct.*

\* \* \*

(e) When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by *clear and convincing evidence* that the defendant is not guilty by reason of insanity." (Emphasis added.) 720 ILCS 5/6—2(a), (e) (West 1996) (invalidated January 22, 1999, by *People v. Reedy*, 186 Ill. 2d 1 (1999)).

Therefore, under the invalidated amended version of the statute, applied in the case at bar, a defendant could no longer raise an insanity defense based on his inability "to conform his conduct to the requirements of law." Further, the amended version increased a defendant's burden of proof from a preponderance of the evidence to clear and

convincing evidence. See Public Act 89—404, § 15, eff. August 20, 1995 (codified at 720 ILCS 5/6—2(a), (e) (West 1996)).

The trial court in this case also instructed the jury that it could return a special verdict of guilty but mentally ill (725 ILCS 5/115—4(j) (West 1996)) if it found the following circumstances present:

"[T]he defendant has proven *by a preponderance of the evidence* that he was mentally ill *** at the time of the [offenses at issue]." (Emphasis added.)

The jury returned a verdict of guilty on all three counts: predatory criminal sexual assault (720 ILCS 5/12—14.1(a)(2)(A) (West 1996)), residential burglary (720 ILCS 5/19—3 (West 1996)), and home invasion (720 ILCS 5/12—11 (West 1996)); and the trial court sentenced the defendant to 25 years' imprisonment on the sexual assault count and two concurrent 10-year sentences for residential burglary and home invasion, to run consecutively with the 25-year sexual assault sentence.

On appeal, the defendant argues that the application of the invalid amended insanity statute warrants reversal because it eliminated the second definition of insanity and increased the defendant's burden of proof. The State argues that the invalid insanity instruction does not warrant reversal because the defendant was not prejudiced by the instruction. We agree with the State.

■ ■ It is well established that a constitutional error in jury instructions warrants reversal only if " 'there is a reasonable possibility that the error contributed to the defendant's conviction.' " *People v. Wanke*, 303 Ill. App. 3d 772, 785 (1999), quoting *People v. McCleary*, 208 Ill. App. 3d 466, 475 (1990). In the case at bar, there is no showing that the invalidated insanity instruction contributed to the defendant's convictions or that the instruction otherwise prejudiced the defendant. We recognize that the defendant in this case was tried under a more stringent burden of proof regarding the insanity defense. The defendant should have been required to prove his insanity by a preponderance of the evidence rather than by clear and convincing evidence, and the defendant was not permitted to establish insanity by proving that he could not conform his conduct to the requirements of the law. However, the defendant ignores that even under the *pre*amended insanity defense statute the defendant had to prove, *as a threshold matter*, that he suffered from a "mental disease or mental defect." 720 ILCS 5/6—2(a) (West 1994). The jury in this case refused to make that finding when it failed to find the defendant guilty but mentally ill. A finding of guilty but mentally ill required the defendant to prove by a preponderance of the evidence that the defendant suffered from a mental disease or defect. Our supreme court has held that mental ill-

ness is a less severe form of insanity. *People v. Lantz*, 186 Ill. 2d 243, 255 (1999) (as the terms are defined, mental illness is a less serious form of psychological functioning than insanity). Thus, even if the jury had been instructed using the preamended insanity defense statute requiring a less stringent burden of proof (preponderance) and including the second definition of insanity, the outcome of the trial would have been the same. If the jury did not find the defendant mentally ill by a preponderance of the evidence, it could not have found the defendant insane by a preponderance of the evidence. Thus, the invalid insanity instruction in this case does not warrant reversal. See *Wanke*, 303 Ill. App. 3d at 785.

We recognize that our supreme court held that the defendant in *People v. Ramsey* was entitled to a new trial because he was convicted under the invalidated amended insanity defense statute. *Ramsey*, 192 Ill. 2d at 157. However, there is nothing in *Ramsey* that indicates that the jury was given the guilty but mentally ill instruction and failed to find the defendant mentally ill or that the supreme court considered the nature and extent of the prejudice under the facts in this case.

We note that Public Act 90—593 (Pub. Act 90—593, eff. June 19, 1998) subsequently reenacted the amendment to the insanity statute. However, the reenacted amendment did not become effective until June 19, 1998, well after the trial in this case. We also recognize that our supreme court stated that application of the reenacted amended version of the insanity defense statute to the defendant's retrial in *Ramsey* would violate the prohibition against *ex post facto* laws. *Ramsey*, 192 Ill. 2d at 158. However, because a new trial is not warranted here, we need not address this issue.

The judgment of the circuit court of Boone County is affirmed.

Affirmed.

RAPP and O'MALLEY, JJ., concur.