No. 2--02--1408

_________________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of Du Page County.

)

Plaintiff-Appellee, )

)

v. ) No. 98--CF--1856

)

DAVID TERAN, ) Honorable

) George J. Bakalis,

Defendant-Appellant. ) Judge, Presiding.

_________________________________________________________________________________

JUSTICE HUTCHINSON delivered the opinion of the court:

Following a jury trial, defendant, David Teran, was convicted of committing the first-degree murder (720 ILCS 5/9--1(a)(1) (West 1998)) of Roderick Floyd.  In finding defendant guilty of this offense, the jury rejected defendant's claim that he was insane under section 6--2(a) of the Criminal Code of 1961 (the Criminal Code) (720 ILCS 5/6--2(a) (West 1998)).  After denying defendant's motion for new trial, the trial court sentenced him to 45 years' imprisonment.  Defendant appeals, contending that section 6--2(a) of the Criminal Code is unconstitutional in that it violates equal protection, due process, and the proportionate penalties clause of our Illinois Constitution (U.S. Const., amend. XIV, §1; Ill. Const. 1970, art. I, §§2, 11).  We affirm.

At trial, the State presented evidence reflecting that on August 28, 1998, the victim was working for a moving company in Addison.  Terry Frazier testified that on August 28, 1998, he and Bill Patterson and the victim returned from a job in Grayslake and in Addison at approximately 10 p.m.  The victim paid them, and then Frazier and Patterson left.  Frazier testified that, before he left, the victim told him that he was going to drive a smaller van home, and the victim checked a load in that van.

Przemysklaw Krynski testified that on August 28, 1998, at approximately 11 p.m., he was driving east on Fay Avenue in Addison, when he observed the victim lying in the street.  Krynski telephoned 911 and reported this to the operator.  Richard Imbordino, a firefighter, testified that he arrived at the scene at 11:42 p.m., and the victim had no vital signs.  Imbordino further testified that the Addison police arrived right after he did.

Shaku Teas, a forensic pathologist, testified regarding his autopsy on the victim.  Teas testified that he found six gunshot wounds and that the victim died of multiple gunshot wounds.  Other witnesses testified regarding their collection of the evidence, including the bullet fragments and gun shell casings found in and around the victim, and testified that the recovered shell casings were fired from the same firearm.

Teresa Burke testified that she was defendant's former spouse.  She testified that she and defendant married in 1985 and had three children.  She first separated from defendant in 1987 because of his "temper mostly" and because he was "threatening" toward her.  Burke described an incident on Father's Day where defendant wanted to get cash from their credit card "so he could buy marijuana."  At the time, she was seven months pregnant.  Burke thought that defendant was going to hit her, but he did not.  Burke further testified that, after they reconciled, they would go out occasionally.  When they went out, Burke was concerned that defendant "might make a scene" because he was "very impatient" and she feared that he might "start yelling and yelling at people."  Burke and defendant again separated for five months in 1991.  When he returned, he became employed at Cumbee Freight as an over-the-road truck driver.

Burke testified that she told defendant in 1997 that she wanted a divorce.  Burke agreed that there were arguments and incidents of threats and violence, but she had not known defendant to be delusional or to have hallucinations.  She testified regarding specific incidents where defendant was verbally and physically threatening toward her and her mother.  According to Burke, defendant relocated to Florida but returned in June 1997.

Burke testified that, although defendant resided in Florida, when he was in Illinois he would occasionally stay in his truck at Louis' Diner in West Chicago.  He would arrange to visit the children.  Burke and the children visited defendant in Florida in April 1998.  While there, defendant told her that he had learned that Louis Teran was not really his father.  Burke testified that she believed defendant was happy about this information because Louis Teran had abused defendant as a child.  Defendant made attempts to locate his natural father, Richard Klein.

Burke testified that on the morning of August 29, 1998, she picked up defendant from Louis' Diner and took him to a bar in West Chicago at 11 a.m.  When she picked up defendant from the bar approximately three hours later, he was "pretty intoxicated."  While she drove defendant back to his truck, defendant mentioned that he had been "abducted."  Burke told him to stop talking because the children were in the car.

Burke further testified that on September 3, 1998, defendant told her that he needed to take some time off from work and that he did not believe his employer would allow this.  Defendant explained that he might quit his job, and he asked Burke to help him clean out his truck.  She agreed to do so, and then Burke followed defendant to Cumbee Freight in Chicago Ridge to give him a ride after dropping off the truck.  Burke testified that, while they were driving away from Cumbee Freight, defendant spoke of having "alien enzymes" that he needed to "release."  Defendant informed Burke that the world was going to end on September 26 with a meteor striking the earth.  Defendant said that his natural father was the head of the "mob" and that "he was given a choice" to either kill Burke or kill someone else.  Defendant told Burke that he chose to kill someone else because he did not want to kill her.

Burke further testified that, when she asked defendant whom he had killed, defendant replied that he killed "some Nigger" with his 9-millimeter pistol at an "[i]ndustrial park in Addison."  Defendant described to Burke that he knocked on the victim's truck, and the victim asked what he had ever done to him.  Defendant said the victim's wife and child saw him commit the shooting.  Defendant told Burke that he had a license to kill and that the police could do nothing.

Burke testified that on September 7, 1998, she reported to the police what defendant had told her.  Burke testified that, other than the prior conversation, defendant never spoke of being an alien, having alien DNA, being a hit man, or being an undercover agent.  Other than when defendant used "hard drugs" as a teenager, Burke did not know defendant to have any hallucinations or delusions.  On cross-examination, Burke admitted that she "tried to get him committed" before she contacted the police.

Michael Simo testified that in September 1998, he was a detective with the Addison police department and investigating the victim's murder.  On September 8, 1998, he spoke with Burke and with James Chambers, defendant's stepbrother, regarding defendant's alleged participation in the shooting.  Simo testified that on September 9 he went with other officers to Aurora to speak with defendant about the shooting; defendant agreed to accompany the officers to the police station.  Detective Van Stedum was also present during the interview.  Simo read 
Miranda
 warnings to defendant, and defendant initialed the form.

Simo testified that defendant initially denied having any knowledge of the shooting and claimed that he had sold his 9-millimeter gun in 1997 in Florida.  The officers told defendant that his brother had told them that defendant had picked up his gun on the night of the shooting and that someone informed them that he was involved in the shooting.  Defendant then asked the officers whether they had run his name through their computer, as it would reveal that he was not to be apprehended if he was wanted for murder.  Defendant claimed that he worked at the Treasury Department and had special assignments that he could not discuss.  When Van Stedum asked defendant whether his brother was involved, defendant became angry and said, "I shot the goddamn coon, no one else was involved, no one else was in the truck with me."  Until this point, the officers never disclosed to defendant that the victim was black.

Simo further testified that defendant said that the shooting occurred near VFN Fiberglass, where his brother worked.  Defendant described a box van in the area, parked on Fay Street.  Defendant approached the victim and started shooting.  Before the shooting, the victim asked defendant what he ever did to defendant.  Defendant said that the last shot was to the back of the victim's head.  After the shooting, defendant went to Louis' Diner.  Simo testified that defendant assisted him in drawing a depiction of the scene of the shooting.

Simo testified that defendant stated that he had disposed of the weapon in pieces in various locations.  Defendant noted that he had thrown the barrel of the gun into the Cal-Sag Canal a few days after the shooting.  Defendant said he used "regular" 9-millimeter ammunition.  At approximately 10 p.m. on September 9, 1998, the officers transferred defendant from Aurora to the Addison police station.

Simo further testified that, at the Addison police department, defendant told the officers that "he had been given his directions and been told what to do."  When he asked defendant whether he would put that in writing, defendant appeared to become angry and told him to call the Treasury Department to verify his version of the events.  Simo and Van Stedum then brought defendant to the crime scene, and defendant directed them to the area of the shooting.  According to Simo's testimony, defendant accurately reenacted the shooting but would not allow the officers to photograph him.

Simo testified that defendant said that he had picked up his gun from his brother's house before the shooting and he and his brother drank beer and shot pool at a bar.  His brother then drove him to Louis' Diner.  Defendant went back to Addison, where the shooting occurred.

On September 10, 1998, Simo and Van Stedum went to the residence of James Chambers.  Chambers gave them various items, including a 9-millimeter Luger hollow-point cartridge, 24 other 9-millimeter cartridges, a Smith & Wesson manual, and checks and money orders in defendant's name.

Simo further testified that on September 10, 1998, defendant wrote a statement in the presence of Van Stedum.  In the statement, which was presented to the jury, defendant asserted that he owned the guns and ammunition recovered from Chambers.  Defendant wrote that he went to Addison, did his "business," and shot at the victim seven or eight times.  The last shot was directed toward the victim's head.  He also noted that he had disposed of the weapon across the country and in the Cal-Sag Canal.

Simo testified that on September 11, 1998, he asked defendant, if the shooting had not been a government hit and if defendant shot the victim because he was angry, would shooting the man have been right or wrong; defendant replied in such a case it would be wrong to kill.  Later that day, Simo told defendant that he did not believe that the shooting was a government hit.  Defendant then asked Simo whether he believed in Nostradamus and said that by midnight he had to kill a person who was alone.  If he did so, he would get his family back.  Defendant then said his natural father was the head of the "Mafia" and had authorized defendant to kill.  Defendant also stated that his mother was impregnated by an alien and that he had been "hidden in the belly of an English pig."  Simo further testified that defendant offered to show him on a map where he had thrown the frame for the gun.  Simo and Van Stedum went to that location on September 25, 1998, and they recovered the gun frame.  The frame was for a Smith & Wesson 9-millimeter, serial No. TET2847.  Simo testified that, during all of the time he spoke with defendant, he had no problems communicating with defendant, and defendant's answers were responsive.

Raymond Perreault, defendant's former neighbor, identified defendant's firearm as a Smith & Wesson 9-millimeter semiautomatic pistol, serial number TET2847.  Perreault further testified that he sold defendant one-half of a box of ammunition, keeping one bullet for his collection.  Perreault testified that he gave the police a bill of sale and the bullet.

The State rested, and defendant called Michael Chiappetta, his retained licensed clinical psychologist, to testify regarding his evaluation of defendant's sanity.  Chiappetta met with defendant on five occasions between May 2001 and August 2001.  Chiappetta testified that he reviewed various materials, including police reports, hospital records, and evaluations by Dr. Corcoran, Dr. Kelly, Dr. Wasyliw, and Dr. Zoot.  He noted that in 1979 defendant was diagnosed as having latent schizophrenia during his hospitalization at River's Edge Hospital, when defendant was approximately 15 years of age.  Chiappetta noted that, although latent schizophrenia was no longer a recognized diagnosis, it was similar to a diagnosis of indeferentia schizophrenia.

Chiappetta further testified that in May 2001 he spoke with corrections officers, who told him that defendant had disorganized behavior and was threatening them and other inmates.  Chiappetta noted that, when defendant arrived at the jail, he was placed on Haldol, an antipsychotic medication, Trazodone to help him sleep, and Cogentin to treat the side effects of Haldol.  After Dr. Corcoran, who had diagnosed defendant with a psychosis, not otherwise specified, changed defendant's medication to Risperdal, a number of defendant's delusions disappeared.  Defendant stopped taking the medications in the summer of 2000.

Chiappetta testified that in June 2001 defendant made "racial epithets" to jail guards, though "the people he spoke to were not of the same race that he was making epithets about."  Defendant told Chiappetta that the word "nigger" was not necessarily a racial term but was a demeaning term he used to refer to anyone he felt was "under him."  Defendant's varied speech volume on that date indicated a disordered behavior, one of the qualities of schizophrenia and psychosis.

Chiappetta testified that, at various times, defendant had differing delusional themes about the shooting, which included the government, mafia, or aliens directing him.  According to Chiappetta, these delusions were directly related to the shooting, and the shooting was committed "with his delusional ideations."  Chiappetta added that defendant had no motive to kill the victim or take his property, and did not make any attempt to conceal the shooting.  Defendant "did what he had to do, according to the delusional themes and he left."

Chiappetta testified that defendant told him that he had written "refused" on two copies of his confession and that, before giving the confession, a gun was held to his head, he was starved, and he was drugged.  Defendant told him that Alberto Louis Teran held a gun to his head to get him to confess.  Defendant also said that his birth certificate was a forgery, and he denied that he had ever served in the Marines.  Chiappetta testified that all of these beliefs were false, and the delusions were an attempt to distance himself from his delusion about the aliens.

Chiappetta noted that Drs. Wasyliw, Kelly, and Corcoran all diagnosed defendant as suffering from psychosis, not otherwise specified.  Chiappetta concluded, though, that on the day of the shooting, defendant was suffering from a cognitive disorder and had disorganized thinking.  Chiappetta opined that the combination of the stress of the breakup of his marriage and the search for his natural father culminated in the development of the delusional ideations.

Chiappetta concluded "to a reasonable degree of psychological certainty" that defendant was not sane at the time of the shooting.  Chiappetta testified that defendant was delusional and had "impaired appreciation of the criminality of his behavior," and this impairment was a result of a mental disease or defect.  Chiappetta continued that, at the time of the shooting, defendant "lacked a substantial appreciation of the criminality of his conduct."  Chiappetta testified that defendant's condition was caused by a combination of a personality disorder, such as antisocial personality disorder, and a psychosis or apparent schizophrenia.

Chiappetta acknowledged that antisocial personality disorder alone was not a mental disease or defect.  Chiappetta agreed that defendant was angry and hostile but did not agree that he "necessarily has antisocial behaviors."  Chiappetta also agreed that his report indicated that defendant had antisocial behaviors.

On rebuttal, the State called Thomas Cumbee, one of defendant's former employers at Cumbee Freight.  Cumbee testified that defendant did a good job, kept to himself, and did not get into trouble.  On September 4, 1998, defendant quit his job, purportedly because he was an "agent for the Treasury" and had been called to duty.  Cumbee testified that, prior to this date, defendant had not demonstrated any delusional beliefs.  Cumbee believed that defendant knew the difference between right and wrong in August and September 1998.  John Cumbee, another former employer, testified that defendant was a good driver and a good worker.  He did not notice defendant exhibit any delusional beliefs.

James Chambers testified that defendant had a "pretty normal" temper.  Chambers testified that in 1998 defendant would occasionally stop by his workplace, which was approximately three blocks from the scene of the shooting.  Chambers testified that on August 28, 1998, at approximately 3:30 p.m., defendant came by his workplace and asked him for his 9-millimeter firearm, which Chambers had been holding for defendant.  Defendant said he wanted to take target practice.  Later that evening, they went to a tavern in Glendale Heights and played pool.

Chambers further testified that, at the tavern, defendant asked Chambers if he believed in aliens.  They left the tavern at approximately 10 p.m., and Chambers last saw defendant at approximately 10:15 p.m.  Chambers never observed defendant having any kind of delusions.

Chambers testified that he again saw defendant on September 3 or 4, 1998, after defendant had quit his job.  Defendant told Chambers that he had "activated" genes in his body and was going to become an alien.  Defendant said nothing to Chambers about shooting the victim.  On cross-examination, Chambers acknowledged that defendant was hospitalized in 1979 for psychiatric reasons following an altercation between defendant and his stepfather.

Lisa Chambers, defendant's stepsister, testified that she saw defendant at her brother James's apartment on August 28, 1998.  She did not observe defendant being delusional at that time, and he made no statements about being an alien.  Mary Miller, defendant's stepmother, also testified that she saw defendant on August 28, 1998, at James's apartment, and he did not appear delusional.  Kathleen Steder, who had dated defendant from March 1998 to August 1998, testified that she saw defendant on August 28, 1998, and he did not mention aliens or seem out of touch with reality.

Jonathan Kelly, a psychiatrist, testified regarding his evaluation of defendant's sanity.  Kelly met with defendant in 1999 for defendant's fitness evaluation, and in October 2001 and in January 2002 regarding defendant's sanity.  Kelly opined that, although defendant was suffering from a mental disease or defect on the date of the shooting, defendant had the "substantial capacity to appreciate the criminality of his conduct" on the date of the shooting.

Kelly further testified that the reasons he believed that defendant could appreciate the criminality of his conduct were that defendant sought out someone to shoot, sought an isolated area in which to approach a victim, waited until dark and no witnesses were present, and approached the victim while holding the gun behind his back.  Kelly continued that, after the shooting, defendant left the scene, went back to where his truck was usually parked, had a couple of beers, and then went to bed.  Kelly also noted that defendant failed to turn himself in or initially admit involvement, disassembled the weapon, and disposed of the pieces while driving cross-country for his job.  Kelly opined that defendant's conduct reflected an effort to avoid apprehension, to dispose of evidence linking him to the crime, and to avoid detection of his criminal behavior.

Kelly also testified regarding defendant's plan for the shooting.  Kelly discussed defendant's familiarity with firearms and stated that defendant had gone to his stepbrother's apartment to retrieve a firearm a few hours before the shooting occurred.  Kelly testified that defendant had told him that, for approximately two weeks prior to the shooting, he had sat in his truck observing people and trying to decide whom he was going to choose to shoot.  Kelly opined that defendant's conduct reflected a premeditated plan to commit the crime.

Kelly further opined that defendant was malingering, reasoning that there was no evidence of delusions prior to August 28, 1998, and when defendant discussed his delusions, he was inconsistent in that the nature of the delusions changed from one interview to the next.  Kelly testified that, based on his review of defendant's records from his 1979 hospitalization, there was evidence that defendant suffered from a "severe character disorder with antisocial features."  Kelly also noted other evidence supporting that diagnosis, including that defendant had been involved in "hundreds of fights during his life," he had "several arrest charges related to battery and criminal damage to property," he had on one occasion "threatened to blow the head of his landlady off," and on another occasion he had thrown his mother-in-law "to the ground and then kicked her and slapped his wife."  Kelly testified that antisocial personality disorder would not qualify as a mental disease or defect.

On cross-examination, Kelly acknowledged that, on August 28, 1998, defendant suffered from a mental illness and a "substantial disorder and thought behavior which impaired his judgment."  He acknowledged that one of his diagnoses, psychotic disorder not otherwise specified, was also a diagnosis that Dr. Orest Wasyliw had made of defendant's condition.

Orest Wasyliw, a clinical psychologist specializing in clinical forensic and neuropsychology, testified that he interviewed defendant three times in 1999 and twice in October 2001.  Wasyliw also performed psychological tests on defendant, reviewed defendant's file, and spoke with Kelly, Detective Simo, and Detective Van Stedum.  Wasyliw concluded that defendant suffered from antisocial personality disorder his entire adult life.  In discussing defendant's 1979 hospitalization, Wasyliw testified that what precipitated the hospitalization was defendant "getting into fights and trouble, including fights with his family and his parents, and using drugs."  Wasyliw diagnosed defendant as suffering from "psychotic disorder, not otherwise specified, with paranoid features."

Wasyliw opined that on August 28, 1998, defendant appreciated the criminality of killing the victim.  Wasyliw opined that defendant was sane at the time of the shooting.  On cross-examination, Wasyliw acknowledged that all of the evaluators agreed that defendant had been experiencing a psychotic disorder for many years before the shooting.

At the close of evidence, the parties presented their closing arguments and the trial court instructed the jury.  The jury received verdict forms by which it could find defendant not guilty; not guilty by reason of insanity; guilty but mentally ill; or guilty of the offense of first-degree murder.  Following deliberations, the jury found defendant guilty of first-degree murder.  The trial court entered judgment on the verdict and ordered a presentence investigation report.  Defendant moved for a new trial, which, after a hearing, the trial court denied.  The trial court sentenced defendant to 45 years' imprisonment.  Defendant timely appeals following the trial court's denial of defendant's postsentencing motion.

Defendant presents the following issue for our review:  whether section 6--2(a) of the Criminal Code is unconstitutional in that it violates equal protection, due process, and the proportionate penalties clause of our Illinois Constitution (U.S. Const., amend. XIV, §1; Ill. Const. 1970, art. I, §§2, 11).

Before addressing defendant's contention, we will address the historical context under which it arises.  In Illinois, all defendants are presumed to be sane.  
People v. McDonald
, 329 Ill. App. 3d 938, 946 (2002), citing 
People v. Williams
, 265 Ill. App. 3d 283, 289 (1994).  However, a defendant may assert the affirmative defense of insanity and, if proved, escape criminal responsibility.  See 720 ILCS 5/6--2 (West 2002).  At least as far back as 1827, our legislature has considered and reconsidered the extent of a criminal defendant's responsibility as it was affected by a mental disorder.  See Rev. Stat. 1827, §§5, 6 (section 5 provides that a "lunatic or insane person, without lucid intervals, shall not be found guilty of any crime *** with which he may be charged").  In its Laws of 1961, the General Assembly revised and enacted the insanity statute, providing in pertinent part:

"A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."  1961 Ill. Laws 1998 (§6--2(a)) (effective January 1, 1962).

In Public Act 82--553, the legislature amended the statute to add a provision allowing for a person to be found guilty but mentally ill and a provision defining the phrases "mental illness" and "mentally ill."  See Pub. Act. 82--553, §1, eff. September 17, 1981.  In Public Act 83--288, the legislature amended the statute to add a provision describing the burden of proof as to the State and to the defendant.  See Pub. Act. 83--288, §1, eff. January 1, 1984.  That provision states, in pertinent part:

"When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by a preponderance of the evidence that the defendant is not guilty by reason of insanity."  Pub. Act. 83--288, §1, eff. January 1, 1984.

In 1995 the statute was again amended.  See Pub. Act 89--404, §15, eff. August 20, 1995 (codified at 720 ILCS 5/6--2 (West 1996)).  This amended version of the statute altered the definition of insanity.  Under the amendment, a defendant could no longer raise an insanity defense based on her or his inability "to conform his conduct to the requirements of law."  The amendment also increased a defendant's burden of proof for an insanity defense from "a preponderance of the evidence" to "clear and convincing evidence."  Pub. Act 89--404, §15, eff. August 20, 1995 (codified at 720 ILCS 5/6--2(a), (e) (West 1996)).

In 1999 our supreme court declared Public Act 89--404 unconstitutional because it was enacted in contravention of the single subject clause of the Illinois Constitution.  See 
People v. Reedy
, 186 Ill. 2d 1, 12 (1999).  As a result, the law was void 
ab initio
, and section 6--2 of the Criminal Code remained as it was before the adoption of Public Act 89--404's amendments.  However, during the pendency of the 
Reedy
 decision, the General Assembly enacted new legislation containing the same revisions to section 6--2 of the Criminal Code originally included in Public Act 89--404.  See Pub. Act 90--593, §15, eff. June 19, 1998.  Public Act 90--593 cured the defects of Public Act 89--404 as determined by 
Reedy
 and has been held not to violate the single subject clause.  See 
People v. Terry
, 329 Ill. App. 3d 1104, 1110 (2002).

Therefore, effective June 19, 1998, section 6--2 of the Criminal Code provided in relevant part:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct.

* * *

(e) When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by clear and convincing evidence that the defendant is not guilty by reason of insanity."  720 ILCS 5/6--2(a), (e) (West 1998).

In the present case, because the crime was allegedly committed on August 28, 1998, the insanity defense statute in effect at the time was the amended version which became effective June 19, 1998.  As stated, the version changed the definition of insanity and increased a defendant's burden of proof.  Defendant on appeal here contends that his equal protection and due process rights were violated when the jury applied the amended insanity statute to his case.  Defendant argues there was no rational basis for removing the prong that would have allowed him to argue at trial that he was unable "to conform his conduct to the requirements of law."  720 ILCS 5/6--2(a) (West 1994).  As part of his argument, defendant notes that the statute providing for the defense of intoxication has retained the prong allowing for a defense based on a defendant's inability "to conform his conduct to the requirements of law."  See 720 ILCS 5/6--3 (West 2002).  Section 6--3 provides in pertinent part:

"A person who is in an intoxicated or drugged  condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."  720 ILCS 5/6--3 (West 2002).

Defendant argues that, in amending the insanity statute but not the intoxication statute, the legislature created a situation where a defendant who cannot conform his conduct to the requirements of law and commits an offense and thereafter seeks an insanity defense to escape criminal responsibility is treated differently from another defendant who, with the same type of mental inability, commits an offense and thereafter seeks an intoxication defense to escape criminal responsibility.  Defendant argues that, under the first scenario, the defendant is criminally responsible, but under the second scenario, the defendant is not criminally responsible.  Defendant concludes that, because of this disparate treatment, the insanity statute is unconstitutional.

The constitutionality of a statute is subject to 
de novo
 review (
People v. Malchow
, 193 Ill. 2d 413, 418 (2000)) and may be raised for the first time on appeal (
People v. Wooters
, 188 Ill. 2d 500, 510 (1999)).  Statutes carry a strong presumption of constitutionality, and the challenging party bears the burden of rebutting that presumption.  
People v. Maness
, 191 Ill. 2d 478, 483 (2000). This court has a duty to interpret a statute in a manner that upholds its validity and constitutionality if it can be reasonably done.  
People v. Fisher
, 184 Ill. 2d 441, 448 (1998).  Our supreme court has previously held that requiring a defendant to prove insanity does not violate due process.  
People v. Scott
, 148 Ill. 2d 479, 541-43 (1992).  Therefore, we will focus our analysis as it pertains to defendant's equal protection claim.

The standards used to determine the constitutionality of a statute under the due process and equal protection clauses are identical.  
People v. Pursley
, 341 Ill. App. 3d 230, 236 (2003), citing 
People v. Kimbrough
, 163 Ill. 2d 231, 242 (1994).  The analysis employed to assess equal protection claims is the same under both the United States and Illinois Constitutions (U.S. Const., amend. XIV, §1; Ill. Const.1970, art. I, §2).  
Fisher
, 184 Ill. 2d at 450; 
People v. Smith
, 345 Ill. App. 3d 742, 748 (2004).  The guarantee of equal protection of the law requires the government to treat similarly situated individuals in a similar manner.  
Fisher
, 184 Ill. 2d at 450; 
Smith
, 345 Ill. App. 3d at 748.  The government may not accord different treatment to individuals who have been placed by statute into different classes based on criteria wholly unrelated to the purpose of the legislation.  The government, however, is not forbidden from drawing proper legislative distinctions among different categories of people.  
Smith
, 345 Ill. App. 3d at 748-49.

The level of scrutiny applicable in reviewing legislative classifications depends on the nature of the classification.  Where the statute creates a "suspect" classification, such as one based on race or national origin, or impinges on fundamental rights, the statute is subject to strict scrutiny.  Statutes that do not implicate these concerns are subject to rational basis review.  
People v. Reed
, 148 Ill. 2d 1, 7 (1992); 
Smith
, 345 Ill. App. 3d at 749.  Here, defendant argues that the insanity statute impermissibly denies him an opportunity to escape criminal responsibility based on his inability to conform his conduct to the requirements of law, while the intoxication statute permits the defense.  The availability of an affirmative defense is not a suspect classification under the equal protection clause; therefore, the amendment to the insanity statute needs only to satisfy the rational basis test.  See 
Reed
, 148 Ill. 2d at 8.

Under the rational basis test our review is limited and deferential; a statutory classification will be upheld if it bears a rational relationship to a legitimate state interest.  
Pursley
, 341 Ill. App. 3d at 236.  If we can reasonably conceive of any set of facts to justify the statutory classification, we will uphold the statute.  
Reed
, 148 Ill. 2d at 8.  Thus, we must determine whether a rational basis exists for denying defendants wishing to raise an insanity defense the opportunity to argue that they should escape criminal liability because they are unable to conform their conduct to the requirements of the law.

It is well established that the legislature, under its police power, has broad discretion to define offenses and prescribe penalties and aggravating factors for the offenses.  
People v. Torres
, 327 Ill. App. 3d 1106, 1113 (2002).  Further, the legislature may amend a statute that it has enacted.  See 
People v. Allen
, 153 Ill. 2d 145, 153 (1992).  As stated earlier, the insanity statute has been periodically amended since 1827.  With respect to the change in the definition of insanity and a defendant's burden of proof, a review of the legislative history reflects that the General Assembly was concerned that the insanity defense had become too easy to raise and too difficult to disprove.  See 
People v. Vernon
, 276 Ill. App. 3d 386, 390 (1995).  The General Assembly may have also been concerned that those committed to psychiatric care after successfully raising an insanity defense could be released into society to again commit criminal acts.  
Vernon
, 276 Ill. App. 3d at 390.  The General Assembly also feared that defendants could fabricate an insanity claim.  
Vernon
, 276 Ill. App. 3d at 390, quoting 83d Ill. Gen. Assem., House Proceedings, June 21, 1983, at 136 (Comments of Representative Johnson) (noting that the legislature stated that the changes now at issue were " 'a modest and reasonable step towards *** putting an out of control defense in some sort of meaningful control' ").  Based on our review of the statute, its history, its legislative history, and other court decisions interpreting the statute, we conclude the General Assembly had a rational basis for amending the definition of insanity.

With respect to the legislature's decision not to change the definition of the intoxication statute when it amended the insanity statute, we believe defendant's argument fails here for a number of reasons.  First, the legislature has no duty to amend its compilation of statutes when it decides to strike language in one statute simply because the same language is contained in another enactment.  Second, we believe that the classes of individuals are not similarly situated.  A person seeking a determination of insanity presents evidence that is primarily subjective (see, 
e.g.
, 
McDonald
, 329 Ill. App. 3d at 946), while a person seeking to establish a defense of an intoxicated or drugged condition may present evidence that includes objective or scientific methods, such as a blood test (see, 
e.g.
, 
People v. Johnson
, 32 Ill. App. 3d 36 (1975)).  Finally, we note that Public Act 90--593 did not change the other prong of the definition of insanity, which permits a defendant to argue that he is not guilty because he "lacks substantial capacity to appreciate the criminality of his conduct."  720 ILCS 5/6--2(a) (West 1996).  Defendant was still free to argue and be found insane under this prong.

Although defendant focuses his brief on the legislature's decision to strike the phrase "conform his conduct to the requirements of law," the legislature's decision to change the burden of proof in section 6--2(e) and its rationale for so changing it are part and parcel of the amendment.  Given the legislature's concerns, we believe that the amendment to section 6--2 of the Criminal Code embodies a rational approach to a perceived problem.  See 
Vernon
, 276 Ill. App. 3d at 390.  Accordingly, we conclude defendant's equal protection and due process rights were not violated.

We also reject defendant's claim that the insanity statute violates the proportionate penalties clause, because defendant lacks standing to make such a claim.  Generally, courts will not consider the validity of a statutory provision unless the person challenging the provision is directly affected by it or the unconstitutional feature is so pervasive as to render the entire statute invalid.  
People v. Morgan
, 203 Ill. 2d 470, 482 (2003), citing 
People v. Palkes
, 52 Ill. 2d 472, 480-81 (1972).  In either case, defendant has standing to bring his constitutional challenge only if he is able to show himself to be within the class aggrieved by the alleged unconstitutionality.  See 
Morgan
, 203 Ill. 2d at 482, citing 
People v. Mayberry
, 63 Ill. 2d 1, 6 (1976).

In the present case, defendant essentially presents a hypothetical situation in which he argues that he would have faced vastly different penalties had he been able to use as his affirmative defense the prior version of the insanity statute.  Of course, this situation also implies that a jury would have found in his favor by a preponderance of the evidence that he suffered from a mental disease or mental defect and that he lacked the ability to conform his conduct to the requirements of law.  In reality, defendant was charged with committing the offense of first-degree murder, and a jury found him guilty of committing first-degree murder.  Implicit in the jury's finding of guilt is a refusal to find that defendant suffered from a "mental disease or mental defect" or that he lacked the "substantial capacity to appreciate the criminality of his conduct," or both.  See 720 ILCS 5/6--2(a) (West 1998); 
People v. Foley
, 318 Ill. App. 3d 38, 44 (2000).  A defendant does not ordinarily have standing to challenge a statute as it might have been applied in different circumstances.  See 
People v. Falbe
, 189 Ill. 2d 635, 644 (2000).  Because defendant is unable to show that he was actually an aggrieved party (see 
Morgan
, 203 Ill. 2d at 482), we conclude defendant has no standing to challenge the penalties he could have faced had the legislature not amended the insanity statute, and had the jury found by a preponderance of the evidence that he suffered from a mental disease or mental defect and was unable to conform his conduct to the requirements of law.

[Nonpublishable material under Supreme Court Rule 23 removed here.]

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

GROMETER and CALLUM, JJ., concur.