THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DUSTIN CLAY, Defendant-Appellant.

First District (1st Division)   No. 1—03—2690

Opinion filed September 30, 2005.

Sam Adam, Sam Adam, Jr., and Richard J. Dvorak, all of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee G. Goldfarb and Sally L. Dilgart, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Defendant Dustin Clay was charged with murder in connection with the stabbing deaths of his girlfriend and two-year-old daughter. After a bench trial, the trial court rejected defendant's insanity defense and found him guilty of murder but mentally ill. Defendant was sentenced to natural life without parole. On appeal, defendant contends that: (1) the Illinois insanity statute (720 ILCS 5/6—2 (West 2000)) violates the due process clauses of the United States and Illinois Constitutions; (2) the Illinois insanity statute violates the prohibition against cruel and unusual punishment under the United States and Illinois Constitutions; (3) the Illinois insanity statute violates the equal protection clauses of the United States and Illinois Constitutions; (4) the trial court erred in finding that defendant was competent to stand trial; and (5) the trial court erred in finding that defendant failed to prove that his actions were a result of mental disease or defect. For the reasons that follow, we affirm.

## BACKGROUND

Defendant lived with his girlfriend Nicole Lafin and their daughter Jade in a condominium owned by defendant's mother Dinah Clay (Mrs. Clay). Nicole was last seen alive early in the evening of Thursday, May 18, 2000. On May 22, 2000, the police went to the apartment to check on Nicole. When the officers and Mrs. Clay announced themselves, it took defendant 15 to 20 minutes to respond. When

asked why it had taken so long to answer the door, defendant stated that he had been sleeping. The bodies of Nicole and Jade were found in the living room.

Officer Robert Smith was assigned to investigate the crime scene and help evidence technicians. He testified as follows. Nicole's body was on the living room floor near the front door. It was covered with a sheet. Jade's body was a few feet away from Nicole's. It was covered with a shirt. A bloody knife was found near Jade's body. There were puddles of blood next to the bodies and bloodstains on the couch cushions and the wall. There were no signs of forced entry into the apartment.

Dr. Aldo Fusaro, an expert in forensic pathology, testified that Nicole sustained 21 stab and incised[1] wounds, including nine wounds to her head, neck and face; three wounds to her chest; and nine wounds to her arms and hands. Jade sustained five stab and incised wounds to the neck, a stab wound beneath her chin, and an incised wound extending from her mouth to her ear. Both bodies had begun to decompose. Judging by the condition of the bodies, Nicole and Jade were probably killed sometime between Thursday, May 18, and Friday, May 19.

Defendant was taken into custody. After administering *Miranda* warnings, Detectives Pulia and Kosik questioned defendant. Detective Pulia testified as follows. At first, defendant was silent and did not respond to the detectives. However, neither did defendant indicate that he did not want to talk to the detectives. At some point, defendant started answering the detectives' questions. The detectives mentioned that people had been calling the apartment looking for Nicole, and she had not been to work since Wednesday. Defendant corrected the detectives, telling them that Nicole was at work on Wednesday and Thursday. Defendant next acknowledged that he had talked to a woman from Nicole's work on Monday and told her that Nicole was not home. Defendant also admitted that he had told his mother when she called that Nicole was not home. When the detectives asked whether it was true that Nicole was in the apartment at the time of the phone calls, defendant put his face in his hands and answered "yes." When asked about his whereabouts since Thursday evening, defendant stated that he stayed home, did not go to the store, and nobody came over. At that point, defendant told the detectives that he did not want to talk anymore, and the interrogation ceased.

During the in-custody search of defendant, an Arlington Heights

---

[1]Dr. Fusaro explained that an incised wound is "a cutting injury that is longer than it is deep."

Motel 6 receipt was discovered. The detectives drove to the Motel 6 and spoke to an employee, Elsa Muneton. The parties stipulated that the detectives showed Ms. Muneton a photograph of defendant, and Ms. Muneton identified defendant as the person who signed in as Dustin Clay.

In late October of 2002, the court held hearings regarding defendant's fitness to stand trial. Two forensic psychiatrists were called to testify—the State called Dr. Roni Seltzberg, and the defense called Dr. Alexander Obolsky.

Dr. Seltzberg testified as follows. Before interviewing defendant, she reviewed a number of documents, including the arrest report, field reports from the police department, the autopsy report, the indictment, and defendant's psychiatric records. Dr. Seltzberg also examined defendant's medical profile from the Cook County jail's department of health services, which indicated that defendant was prescribed Zoloft, an antidepressant. In addition, she spoke with the defendant's counsel (an assistant public defender) and an assistant State's Attorney.

Dr. Seltzberg first interviewed defendant on May 17, 2001. During the interview, she inquired into defendant's educational and social background, substance abuse history, psychiatric history, ability to understand the charges against him, and his recollection of the events in the case. Regarding substance abuse, Dr. Seltzberg noted that defendant reported using marijuana in the past. When Dr. Seltzberg told defendant that he was charged with double murder, defendant remarked that he was facing the death penalty. Defendant was able to tell Dr. Seltzberg his next court date and who was the presiding judge. He was able to explain the roles of the assistant State's Attorney and his attorney. Defendant expressed trust in his attorney and stated that he had no difficulty in communicating with her, noting that he could best help his attorney by telling her the truth. Defendant also indicated that he understood: the nature of trial proceedings, including direct and cross-examinations; that he had the right to testify, but was not required to do so; and the nature of plea bargaining. When asked about his understanding of an insanity defense, defendant told Dr. Seltzberg that an insanity defense meant that he was " 'not being mentally able to understand the situation.' " Dr. Seltzberg stated that, overall:

> "[Defendant] was oriented to time, place, person, situation. He was not agitated. There was no slowing of his movement or thoughts. There was no thought disorder noted ***, nothing delusional.
>
> He was responding to questions as if we were having a regular conversation. *** [N]o long delays for him to think about it.
>
> His speech was of normal rate, normal volume. The only thing

that I noted [was] that even though his mood was fine, \*\*\* his outward presentation of his emotions[ ] was kind of flat. He maintained good eye contact. He was cooperative with the evaluation other than not wanting to discuss a couple of things."

On cross-examination, however, Dr. Seltzberg admitted that during a subsequent interview in February of 2002 defendant had told her that he was withholding information from his attorney regarding his alibi defense. Defendant indicated that he believed that if he revealed his alibi witness then some unspecified individuals involved in the drug trade might hurt or kill him or his family. In Dr. Seltzberg's opinion, this withholding of a potential witness "may or may not" have been based on a delusional belief. In addition, Dr. Seltzberg admitted having concerns that defendant had a delusional belief about having been adopted. Defendant based this belief on the fact that he had a "widow's peak" hairline and his parents did not. In Dr. Seltzberg's view, defendant's explanation was "a little bit odd." Dr. Seltzberg additionally recalled reading a report prepared by a social worker who interviewed defendant's parents, where Mrs. Clay indicated that defendant was obsessed with the idea that a record producer had mailed him a check for a million dollars and Mrs. Clay had stolen it.

Dr. Seltzberg further admitted on cross-examination that she was aware of defendant's multiple prior hospitalizations for psychiatric problems. She had reviewed medical records from the hospitals where defendant had undergone psychiatric evaluations on four different occasions in 1999.[2] Dr. Seltzberg stated that according to the records, defendant was brought into the emergency room on the first occasion after being found in a catatonic state in his car at a public intersection. Defendant's condition was described as an acute psychotic reaction, possibly attributable to drug use. The second time he was brought into the emergency room, defendant was confused and possibly catatonic. The medical records in regard to that hospitalization "referred to [a] diagnostic impression of an acute psychotic reaction possibly secondary to marijuana." However, defendant's catatonic state may have also been explained by low potassium levels. When defendant was admitted on the third occasion, he was "totally noncommunicative for several days and acting in a guarded manner." Thereafter, defendant displayed psychotic symptoms, which included religious delusions and "paranoid and anxious affect."[3] Defendant was "preoccupied with internal stimuli"—meaning, in lay terms, that he may have been hearing voices or experiencing visual hallucinations.

---

[2]The records themselves were not admitted into evidence.

[3]Affect is the outward showing of emotion.

For instance, without any prompting from the hospital personnel, defendant stated that he was not the devil. Defendant was hospitalized for the fourth time after attacking his father at work. During that hospitalization, as well as on previous occasions, defendant was prescribed antipsychotic medication. Defendant, however, refused to take it and did not return for follow-up treatment.

Based on defendant's documented psychiatric history, Dr. Seltzberg rendered a provisional diagnosis of nonspecific psychotic disorder. Nevertheless, Dr. Seltzberg opined that defendant was fit to stand trial with the antidepressant medication prescribed (Zoloft) because he understood the nature of the charges and proceedings against him; he was capable of assisting his defense counsel; and his medication was not adversely affecting him in those respects.

On April 3, 2002, Dr. Seltzberg again interviewed defendant to make an updated fitness determination. Prior to the interview, she reviewed additional documents, including reports of other psychiatric examiners. Dr. Seltzberg asked defendant the same types of questions as during the first interview. She again found that defendant was aware of the charges against him, of the various court proceedings, and of the possible outcomes of his case. Dr. Seltzberg noted that defendant's condition improved in that he did not present with a "flattened effect." She also noted that defendant continued to take Zoloft daily. Dr. Seltzberg's opinion that defendant was fit to stand trial with the medication prescribed to him did not change.

Dr. Seltzberg again evaluated defendant in July and early October of 2002. Her opinion regarding defendant's fitness to stand trial did not change. Dr. Seltzberg disagreed with Dr. Michael D'Amenico,[4] another psychiatric examiner involved in the case whose report she had reviewed. Specifically, Dr. Seltzberg disagreed with Dr. D'Amenico's conclusion that defendant did not understand the charges against him, was not capable of assisting his counsel, and was psychotic. Regarding Dr. D'Amenico's opinion that defendant suffered from schizophrenia, Dr. Seltzberg conceded that "[h]e may," but that was not her diagnosis at the time. Dr. Seltzberg also discussed Dr. Obolosky's finding that defendant had a psychotic disorder and was not capable of sufficiently assisting the defense counsel. She, however, disagreed with Dr. Obolsky that defendant should be given antipsychotic medication to render him fit to stand trial. In Dr. Seltzberg's opinion, "while [antipsychotic] medication might somehow be beneficial ***, it was not required"; defendant "was fit for trial regardless of whether or not he took an antipsychotic agent in addition [to Zoloft]."

---

[4]Also referred to in the record as Dr. DiDomenico.

Dr. Obolsky, however, concluded that defendant was a paranoid schizophrenic who experienced delusions which rendered him unable to meaningfully assist in his defense and, therefore, unfit to stand trial. Dr. Obolsky testified that he based his opinion on multiple interviews with defendant (on December 9, 2000; March 8, 2001; July 5, 2001; March 13, 2002; and October 31, 2002), as well as on defendant's psychiatric records and police reports. He had also reviewed reports by other psychiatrists in the case. In support of the diagnosis of paranoid schizophrenia, Dr. Obolsky pointed out that defendant's mental health changes necessitating the first hospitalization were sudden; medical tests showed no physical cause of his symptoms; defendant had delusions that he was evil, including that he was Satan, as well as auditory hallucinations (hearing voices); and defendant's speech during psychotic episodes was so incomprehensible that others could not understand him. Dr. Obolsky also noted that defendant was diagnosed as a schizophrenic when he was hospitalized and was prescribed antipsychotic medications. Dr. Obolsky disagreed that defendant's psychotic symptoms might be attributable to marijuana use because marijuana "is not known to cause [those] kind[s] of symptoms." Although Dr. Obolsky agreed with Dr. Seltzberg that defendant could generally understand and discuss the proceedings against him, Dr. Obolsky observed that when asked to discuss the events surrounding the deaths of his girlfriend and daughter, defendant's affect and thinking changes—defendant "becomes almost mute, and he is unable to explain what happened." When defendant did come up with explanations, his answers were "bizarre" and "not rational." Dr. Obolsky summed up his finding:

"So what we have is an individual, who, on one particular topic his thinking is psychotic, and that is about the events of the crime."

Dr. Obolsky ruled out malingering, *i.e.*, that defendant was attempting to present himself as mentally ill when he was not.

Dr. Obolsky further testified that he had asked the jail authorities to put defendant on antipsychotic medication, but to his knowledge that had not happened. On direct examination Dr. Obolsky stated:

"[W]ithout [antipsychotic] medication, and without the resolution of the delusion that he holds, [defendant] is not fit for trial because his is not able to help *** his attorney to cross-examine witnesses, to provide any kind of reasonable answers as to what happened, to provide any answers as to what possible alibi he may have had. He is just not able to be an active participant, a competent participant, in his own defense."

Dr. Obolsky opined that antipsychotic medication would stabilize defendant's psychotic symptoms and would significantly decrease or

eliminate the delusions, thus allowing the defendant to meaningfully assist in his defense. Dr. Obolsky recommended that defendant be placed for treatment at the Elgin Mental Health Center.

On cross-examination Dr. Obolsky, however, admitted that in March of 2001, after having reviewed the pertinent documents, he found defendant fit to stand trial. Dr. Obolsky explained that he found defendant fit because, at that time, defendant's counsel did not think that defendant's nondisclosure to her of the alibi witness and certain other information would interfere with her ability to present a competent defense. Dr. Obolsky's opinion regarding defendant's fitness changed on March 13, 2002, because of growing concern that defendant's nondisclosure to his attorney of his perception of the events surrounding the killings would negatively impact on his ability to assist in his own defense. In Dr. Obolsky's view, defendant's reasons for nondisclosure were psychotic.

Dr. Obolsky further explained that at one point he asked defendant "why when allegedly he discovered the bodies on coming to the condominium, *** didn't he call the police? That would be very important information in his defense. When he supposedly left the bodies, stayed in the motel, and then he came back, the question is why did you come back? The answer would be very important, why didn't you call the police at that time would be very important in his defense."

In Dr. Obolsky's opinion, defendant's answers to these questions were also psychotic. Dr. Obolsky went on to explain that otherwise normal-appearing individuals may hold psychotic beliefs that they keep to themselves:

"There are lots of people who suffer from paranoid schizophrenia who think that the FBI is out to get them and the FBI has not a care in the world about this particular individual, and these individuals are able to work. They may have a family, and as long as you don't ask them about the FBI, you'll never hear anything psychotic. But once you ask the right question you get all kinds of bizarre, strange thoughts coming out from a person who otherwise goes to the gym, is eating all right, is not fighting with anyone, and I believe unfortunately that's the problem we are facing is that we have an individual who, by all accounts, is able to behave and maintain himself relatively normally in [the] Cook County Jail, but when you start talking to him about this one issue that is of particular importance for this trial, of his guilt or innocence, not his fitness, he is not able to give the kind of answers, because of his delusion, not because he is willful, that would help you to mount a successful defense or competent defense."

With respect to defendant's withholding information about a potential

alibi witness, an issue that Dr. Seltzberg addressed in her testimony, Dr. Obolsky on cross-examination admitted that it was possible that defendant may have made a nonpsychotic and rational decision to withhold that information in order to protect himself or others.

The trial court found that there was no dispute that defendant was able to understand the nature of the proceedings against him and the roles of various individuals involved; rather, the dispute was over whether defendant had the capability to adequately work with his counsel to prepare a competent defense. In this respect, the trial court found that defendant was able to do so. The trial court expressed two primary reasons for giving Dr. Seltzberg's opinion greater weight than Dr. Obolsky's: (1) the delusion presented itself "only as to this particular event," namely, the deaths of Nicole and Jade; (2) Dr. Obolsky initially found defendant fit and changed his opinion in the absence of any new information or any other intervening facts.

The case proceeded to trial. Defendant presented an insanity defense. Dr. Obolsky was called to testify for the defense. Dr. Obolsky stated that contemporaneously with evaluating defendant's fitness to stand trial, he evaluated defendant's sanity at the time of the deaths of Nicole and Jade. Dr. Obolsky reviewed the police reports, the autopsy reports, and defendant's psychiatric records, interviewed defendant on multiple occasions, and interviewed Mrs. Clay. In addition, Dr. Obolsky relied on the report of Dr. D'Amenico. Dr. Obolsky also reviewed the reports of Drs. Seltzberg and Stafford Henry, who both testified for the State at trial, as well as the records of the social worker on the case. In Dr. Obolsky's opinion, defendant was insane at the time of the deaths of Nicole and Jade—in other words, defendant was unable to appreciate the criminality of his conduct because he was in a psychotic state. In drawing this conclusion, Dr. Obolsky relied on the records of defendant's psychiatric hospitalizations—which, in his opinion, indicated that defendant "was experiencing [a] rapidly progressing mental disorder," and that defendant had all the symptoms of paranoid schizophrenia.[5] Dr. Obolsky pointed out that defendant was diagnosed with schizophrenia when he was hospitalized. Dr. Obolsky further noted that defendant's psychiatric records indicated that his treating physicians considered committing him to a psychiatric facility against his will, but apparently did not carry that

---

[5]According to the Diagnostic and Statistical Manual of Mental Disorders, which is a compilation of all currently accepted psychiatric diagnoses, the symptoms of paranoid schizophrenia are: delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, and negative symptoms such as affective flattening.

out. Dr. Obolsky additionally stated that the records indicated that defendant was noncompliant with his medications; did not appreciate the fact that he had a mental illness; had poor contact with reality; was paranoid; was in severe depression; and had violent outbursts. Dr. Obolsky also related some of his conversations with Mrs. Clay in which she described defendant's abnormal behaviors and stated that there was a family history of schizophrenia. Mrs. Clay additionally told Dr. Obolsky that shortly before the time of the deaths of Nicole and Jade, defendant was irritable, very angry and delusional. Lastly, Dr. Obolsky considered defendant's behavior subsequent to the killings—that he spent a night in a hotel and then returned and slept in the same apartment with dead bodies—as indicating that defendant did not appreciate the criminality of his actions.

Dr. Seltzberg testified for the State. She, too, evaluated defendant's sanity contemporaneously with his fitness to stand trial and relied on the documents previously noted. Dr. Seltzberg "most definitely" believed that defendant suffered from a mental disorder; however, in her opinion, it was not really clear whether he was a schizophrenic. Dr. Seltzberg explained that a patient with schizophrenia may experience waxing and waning of symptoms, but, more often than not, there are no remissions. Here, however, during the three years of incarceration prior to the trial, defendant experienced "long periods of apparent remission with no behavior problems, no hallucinations, [and] no obvious delusions."[6] Dr. Seltzberg's diagnosis of defendant's condition, therefore, remained "some psychotic disorder not otherwise specified ***, currently in remission." Dr. Seltzberg noted that there were no reports or other records that would help her evaluate defendant's sanity at the time of the killings. She also noted that defendant had no documented history of delusional thinking with respect to Nicole and Jade. When Dr. Seltzberg spoke to defendant about the events surrounding the deaths of Nicole and Jade, defendant adamantly denied killing them. Defendant told Dr. Seltzberg that after he discovered the bodies, he stayed in the apartment for several hours, not knowing what to do and feeling scared. He covered Jade with one of his shirts and Nicole with a sheet because he could not stand looking at them. Defendant was afraid that whoever killed Nicole and Jade would come back and kill him. After a few hours, he drove to a motel, stayed overnight and returned the next morning. Ultimately, because of a lack of sufficient information upon which to base an opinion, as well

---

[6]To that, Dr. Obolsky responded that incarceration provides a structured environment, similar to that at a mental hospital, which is beneficial for persons with schizophrenia.

as because of the difficulties inherent in any psychiatric diagnosis, Dr. Seltzberg concluded that she could not form an opinion regarding defendant's sanity at the time of the killings.

Dr. Stafford Henry, another forensic psychiatrist called by the State, testified that he was also assigned to give an opinion regarding defendant's sanity. Dr. Henry interviewed defendant three times, and reviewed all the pertinent documents and records, as well as the reports of Drs. Obolsky and Seltzberg. Defendant initially told Dr. Henry that he did not have any history of psychiatric problems. When confronted with his past hospitalizations, defendant refused to talk about them. Defendant also refused to discuss the events surrounding the killings. Like Dr. Seltzberg, Dr. Henry was unable to render an opinion regarding defendant's sanity at the time of the killings, nor, for that matter, was he able to render an opinion as to whether defendant was mentally ill. Dr. Henry noted, however, the lack of evidence that defendant had delusional thinking with respect to Nicole and Jade, but, on the other hand, there was evidence that defendant had a history of domestic friction with Nicole.

The trial court found that the State met its burden of proving defendant guilty beyond a reasonable doubt of murdering Nicole and Jade. The court further found that defendant was suffering from a mental illness or disorder; however, defendant failed to prove by clear and convincing evidence that he was unable to appreciate the criminality of his actions at the time of the murders. Therefore, the court rejected the insanity defense and entered a finding of guilty but mentally ill. This appeal followed.

## ANALYSIS

■ We initially note that defendant does not challenge the State's proof of his commission of the killings of Nicole and Jade. This appeal is solely concerned with issues relating to the insanity defense. As noted, defendant contends that: (1) the Illinois insanity statute (720 ILCS 5/6—2 (West 2000)) violates the due process clauses of the United States and Illinois Constitutions; (2) the Illinois insanity statute violates the prohibition against cruel and unusual punishment under the United States and Illinois Constitutions; (3) the Illinois insanity statute violates the equal protection clauses of the United States and Illinois Constitutions; (4) the trial court erred in finding that defendant was competent to stand trial; and (5) the trial court erred in finding that defendant failed to prove that his actions were a result of mental disease or defect. Defendant did not raise the foregoing constitutional challenges at trial. However, a challenge to constitutionality of a criminal statute may be raised for the first time on appeal. *People v. Wooters*, 188 Ill. 2d 500, 510, 722 N.E.2d 1102, 1108 (1999).

Statutes enjoy a strong presumption of constitutionality, and we have a duty to construe them in a manner that upholds their validity whenever reasonably possible. *People v. Huddleston*, 212 Ill. 2d 107, 128-29, 816 N.E.2d 322, 335 (2004). The party who challenges a statute bears the burden of demonstrating its invalidity. *Huddleston*, 212 Ill. 2d at 129, 816 N.E.2d at 335.

## Due Process Challenge

■ Defendant contends that the Illinois insanity statute (720 ILCS 5/6—2 (West 2000)) violates the due process clauses of the United States and Illinois Constitutions because it allows for the convictions of persons who are more likely than not insane at the time of the offense. Defendant asserts that this is an issue of first impression in Illinois.

Effective June 19, 1998, the insanity statute required a defendant to prove by "clear and convincing evidence" that he or she was insane at the time of the commission of the offense. 720 ILCS 5/6—2 (West 2004). The clear and convincing standard requires a quantum of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt. *In re D.T.*, 212 Ill. 2d 347, 362, 818 N.E.2d 1214, 1226 (2004); see also Illinois Pattern Jury Instructions, Criminal, No. 4.19 (3d ed. Supp. 1996) (defining the clear and convincing standard in terms of high probability). As defendant points out, before 1995, the insanity statute required a defendant to prove insanity by a preponderance of the evidence. In 1995, the legislature passed a law that, among other things, increased the burden of proof in the insanity defense to clear and convincing evidence. See Pub. Act 89—404, § 15, eff. August 20, 1995 (codified at 720 ILCS 5/6—2(a), (e) (West 1996)). In 1999, the supreme court declared Public Act 89—404 unconstitutional because its diverse subject matter, including civil subjects, violated the Illinois Constitution's single-subject clause. See *People v. Reedy*, 186 Ill. 2d 1, 11-12, 708 N.E.2d 1114, 1119 (1999). However, during the pendency of the *Reedy* decision, the General Assembly reenacted the criminal provisions of Public Act 89—404, including the revisions to the insanity statute. See Pub. Act 90—953, § 15, eff. June 19, 1998. Defendant does not contend that the new legislation suffers from the same infirmity as its 1995 counterpart. We note that Public Act 90—953 cured the defects of Public Act 89—404 and has been held not to violate the single-subject clause. See *People v. Terry*, 329 Ill. App. 3d 1104, 1110, 769 N.E.2d 559, 564 (2002). Rather, defendant contends that the clear and convincing burden of proof in the insanity defense is unconstitutional as contrary to the deeply rooted traditions of Anglo-American, as well as Illinois, jurisprudence.

Defendant further contends that the heightened burden of proof is irrational, unfair and contrary to contemporary practice employed by other states. Defendant draws our attention to the fact that Illinois is among the minority of jurisdictions requiring a clear and convincing proof of insanity. Only six other states[7] and the federal government impose that high a standard of proof.

### a. The United States Constitution

The State argues that the decision of the Supreme Court in *Leland v. Oregon*, 343 U.S. 790, 96 L. Ed. 1302, 72 S. Ct. 1002 (1952), forecloses defendant's challenge to the constitutionality of the clear and convincing burden of proof in the insanity defense. In *Leland*, the Supreme Court rejected the due process challenge to an Oregon statute that required a defendant to prove his insanity beyond a reasonable doubt. *Leland*, 343 U.S. at 798-99, 96 L. Ed. at 1308-09, 72 S. Ct. at 1007-08. Although noting that Oregon was alone in requiring a defendant to prove his insanity beyond a reasonable doubt, whereas some 20 states required proof of insanity by a preponderance of the evidence,[8] the Supreme Court stated:

> "While there is an evident distinction between these two rules as to the quantum of proof required, we see no practical difference of such magnitude as to be significant in determining the constitutional question we face here. Oregon merely requires a heavier burden of proof. ***
>
> *** We are *** reluctant to interfere with Oregon's determination of its policy with respect to the burden of proof on the issue of sanity since we cannot say that policy violates generally accepted concepts of basic standards of justice." *Leland*, 343 U.S. at 798-99, 96 L. Ed. at 1308-09, 72 S. Ct. at 1007-08.

*Leland* also rejected the argument that the heightened burden of proof was unconstitutional because it was contrary to contemporary practice employed by other states. See *Leland*, 343 U.S. at 798, 96 L. Ed. at 1309, 72 S. Ct. at 1007 ("[t]he fact that a practice is followed by a large number of states is not conclusive in a decision as to whether that practice accords with due process"); accord *Martin v. Ohio*, 480 U.S. 228, 236, 94 L. Ed. 2d 267, 276, 107 S. Ct. 1098, 1103 (1987) (the question of whether a state statute violates the constitution is "not

---

[7]Alabama, Arizona, Florida, New Hampshire, South Dakota and Tennessee. See 1 W. LaFave, Substantive Criminal Law § 8.3(a), at 601 n.15 (2d ed. 2003); Fla. Stat. Ann. § 775.027 (West 2000).

[8]The remaining states regarded sanity to be an element of a charged offense.

answered by cataloging the practices of other [s]tates"); *Medina v. California*, 505 U.S. 437, 447, 120 L. Ed. 2d 353, 364, 112 S. Ct. 2572, 2578 (1992) (contemporary practice is of limited relevance to the due process inquiry).

The Supreme Court has repeatedly reaffirmed *Leland*. See *Martin*, 480 U.S. at 236, 94 L. Ed. 2d at 276, 107 S. Ct. at 1103 ("[w]e have had the opportunity to depart from *[Leland]*, but have refused to do so"); *Jones v. United States*, 463 U.S. 354, 368 n.17, 77 L. Ed. 2d 694, 707 n.17, 103 S. Ct. 3043, 3051 n.17 (1983) ("[a] defendant could be required to prove his insanity by a higher standard than a preponderance of the evidence"); *Patterson v. New York*, 432 U.S. 197, 207, 53 L. Ed. 2d 281, 290, 97 S. Ct. 2319, 2325 (1977) ("[w]e are unwilling to reconsider *Leland*"); *Rivera v. Delaware*, 429 U.S. 877, 50 L. Ed. 2d 160, 97 S. Ct. 226 (1976) (request to overrule *Leland* dismissed for want of substantial federal question). Lower federal courts, construing a similar provision of the Insanity Defense Reform Act of 1984 (now codified at 18 U.S.C. § 17(b) (2000)), have held that the clear and convincing standard passes constitutional muster. See, *e.g.*, *United States v. Pryor*, 960 F.2d 1, 3 (1st Cir. 1992) (*Leland* has settled the constitutionality of such burden); accord *United States v. Amos*, 803 F.2d 419, 421-22 (8th Cir. 1986); *United States v. Freeman*, 804 F.2d 1574, 1576 (11th Cir. 1986) ("*Leland* compels a holding that the aspect of the Insanity [Defense] Reform Act of 1984 requiring a defendant to prove insanity by clear and convincing evidence is constitutional"). It appears that no court has invalidated a statute that imposed the clear and convincing burden of proof in the insanity defense. See J. Zitter, Annotation, *Construction and Application of 18 U.S.C.A. § 17, Providing for Insanity Defense in Federal Criminal Prosecutions*, 118 A.L.R. Fed. 265, 276-77 (1994); 1 W. LaFave, Substantive Criminal Law § 8.3(a), at 600-01 (2d ed. 2003).

Defendant, nevertheless, argues that the decision of the Supreme Court in *Cooper v. Oklahoma*, 517 U.S. 348, 134 L. Ed. 2d 498, 116 S. Ct. 1373 (1996), compels a decision in his favor. We disagree. In *Cooper*, the Supreme Court held that the state denied the defendant due process of law when it required him to prove his unfitness to stand trial by clear and convincing evidence. *Cooper*, 517 U.S. at 355-56, 369, 134 L. Ed. 2d at 507, 515, 116 S. Ct. at 1377, 1384. *Cooper*, however, only addressed the question of the quantum of proof with respect to unfitness to stand trial and did not reach the issue of the quantum of proof required in the insanity defense. As the State points out, there are significant differences between a claim of unfitness to stand trial and a plea of insanity. In a fitness hearing, the emphasis is on the defendant's capacity to consult with counsel and to comprehend the

proceedings—" 'this is by no means the same test as those which determine criminal responsibility at the time of the crime.' " *Medina*, 505 U.S. at 448, 120 L. Ed. 2d at 365, 112 S. Ct. at 2579, quoting *Pate v. Robinson*, 383 U.S. 375, 389, 15 L. Ed. 2d 815, 824, 86 S. Ct. 836, 844 (1966) (Harlan, J., dissenting joined by Black, J.). "Moreover, while the Due Process Clause affords an incompetent defendant the right not to be tried[ ] [citations], we have not said that the Constitution requires the States to recognize the insanity defense [citation]." *Medina*, 505 U.S. at 449, 120 L. Ed. 2d at 365, 112 S. Ct. at 2579. Lastly, *Cooper* never discussed *Leland* and thus cannot be said to have overruled it. Accordingly, defendant's reliance on *Cooper* is misplaced.

Because *Leland* remains good law, it also forecloses defendant's challenge to the insanity statute on the basis that the heightened burden of proof is irrational. In any event, where, as here, no fundamental due process right is implicated, the statute need only pass the "rational basis" test in order to be upheld. See, *e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 722, 138 L. Ed. 2d 772, 788-89, 117 S. Ct. 2258, 2268 (1997). The rational basis test is highly deferential and only requires that the statute "be rationally related to legitimate government interests." *Glucksberg*, 521 U.S. at 728, 138 L. Ed. 2d at 792, 117 S. Ct. at 2271. When the General Assembly amended the insanity statute to increase the burden of proof, it voiced the concern that the mentally ill might be released into society to commit additional criminal acts. See *People v. Teran*, 353 Ill. App. 3d 720, 733-34, 818 N.E.2d 1278, 1290 (2004); *People v. Vernon*, 276 Ill. App. 3d 386, 390, 657 N.E.2d 1117, 1121 (1995). The State has an undisputable interest in protecting the community from those who are both mentally ill and dangerous (see *Addington v. Texas*, 441 U.S. 418, 426, 60 L. Ed. 2d 323, 331, 99 S. Ct. 1804, 1809 (1979)), and the legislation at issue furthers this interest.

### b. The Illinois Constitution

Defendant contends that the imposition of the heightened burden of proof is contrary to long-standing precedent of the Illinois Supreme Court and offends Illinois' deep history of protecting the rights of the insane. For over a century, the supreme court adhered to the principle that sanity was an element of the offense, *i.e.*, that the State was required to prove defendant sane beyond a reasonable doubt. See *Chase v. People*, 40 Ill. 352 (1866); *People v. Casey*, 231 Ill. 261, 83 N.E. 278 (1907); *People v. Gold*, 38 Ill. 2d 510, 232 N.E.2d 702 (1967). However, in 1983, the General Assembly amended the insanity statute to make insanity an affirmative defense that must be proven by a preponderance of the evidence. See *Teran*, 353 Ill. App. 3d at 730-31,

818 N.E.2d at 1287. Our supreme court had an opportunity to address that amendment and upheld it against a constitutional challenge. See *People v. Scott*, 148 Ill. 2d 479, 541-43, 594 N.E.2d 217, 242-43 (1992) (a defendant's sanity is not an element of a charged offense, and neither the federal nor the Illinois Constitution prohibits placing the burden on a defendant to prove his insanity). Defendant nevertheless contends that saddling him with an additional burden of the higher standard of proof goes too far. We disagree.

We first note that, notwithstanding the rule that the party who challenges a statute bears the burden of demonstrating its invalidity (*Huddleston*, 212 Ill. 2d at 129, 816 N.E.2d at 335), defendant offers no authority indicating that the Illinois Constitution would be inhospitable to this heightened burden of proof. We acknowledge that in upholding the constitutionality of the 1983 amendment to the insanity statute, our supreme court recognized that " '[a]lthough the [due process] language of the two constitutions is the same, the scope of Illinois' due process provision need not be identical to that of the United States Constitution.' "[9] *Scott*, 148 Ill. 2d at 541, 594 N.E.2d at 243, quoting *People v. Hightower*, 172 Ill. App. 3d 678, 683, 526 N.E.2d 1129, 1131 (1988). Nevertheless, the supreme court reached the result under the Illinois Constitution that was consistent with *Leland* with respect to shifting the burden of proof on a defendant. While in *Scott* the operative statute's burden of proof requirement was by a preponderance of the evidence, as opposed to beyond a reasonable doubt in *Leland*, there is no reason to think, in the absence of any citations to the contrary, that our supreme court which concurred with *Leland* in regard to shifting the burden of proof would part ways with *Leland* with respect to the quantum of proof, especially since the quantum of proof by clear and convincing evidence the statute imposes today is still less than that in *Leland*.

### Cruel and Unusual Punishment

■ Defendant reiterates the argument that the insanity statute is unconstitutional because it punishes those persons whose crimes were more likely than not the result of their mental illness. Defendant contends that, in doing so, the Illinois insanity statute violates the

---

[9]While under the "lockstep doctrine" Illinois courts follow the decisions of the Supreme Court where the state and federal constitutional provisions and issues are similar, Illinois courts are reluctant to apply the lockstep doctrine when interpreting the due process clause of the Illinois Constitution. See *People v. DiGuida*, 152 Ill. 2d 104, 119, 604 N.E.2d 336, 342-43 (1992); *Van Harken v. City of Chicago*, 305 Ill. App. 3d 972, 982, 713 N.E.2d 754, 762 (1999).

prohibition against cruel and unusual punishment of the United States and Illinois Constitutions.

We note that the eighth amendment prohibits excessive sanctions. Central to it is a " 'precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense.' " *Atkins v. Virginia*, 536 U.S. 304, 311, 153 L. Ed. 2d 335, 344, 122 S. Ct. 2242, 2246 (2002), quoting *Weems v. United States*, 217 U.S. 349, 367, 54 L. Ed. 793, 798, 30 S. Ct. 544, 549 (1910). Defendant relies on *Atkins* (the eighth amendment prohibits execution of the mentally retarded), *Ford v. Wainwright*, 477 U.S. 399, 91 L. Ed. 2d 335, 106 S. Ct. 2595 (1986) (the eighth amendment forbids execution of insane individuals), and *Robinson v. California*, 370 U.S. 660, 8 L. Ed. 2d 758, 82 S. Ct. 1417 (1962) (striking down a statute that made it a criminal offense to be addicted to drugs). We agree with the State that defendant's argument lacks merit.

*Atkins* and *Ford* do not support defendant's position. Both cases made clear that it is the death penalty, as opposed to a sentence of imprisonment, that comes under a closer scrutiny under the eighth amendment. See *Atkins*, 536 U.S. at 321, 153 L. Ed. 2d at 350, 122 S. Ct. at 2252 ("death is not a suitable punishment for a mentally retarded criminal. We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty"); *Ford*, 477 U.S. at 409, 91 L. Ed. 2d at 346, 106 S. Ct. at 2601 ("For today, no less than before, we may seriously question the retributive value of executing [an insane] person who has no comprehension of why he has been singled out and stripped of his fundamental right to life. [Citation.] Similarly, the natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity is still vivid today"). There is no reason, however, to believe that the Supreme Court's reluctance to uphold executions of the mentally retarded or mentally ill criminals would apply to a lesser punishment involving imprisonment. This much was, in fact, articulated by the Supreme Court in *Atkins*:

> "Those mentally retarded persons *who meet the law's requirements for criminal responsibility* should be tried and punished when they commit crimes." (Emphasis added.) *Atkins*, 536 U.S. at 306, 153 L. Ed. 2d at 341, 122 S. Ct. at 2244.

*Robinson* is also distinguishable because it held that a state may not punish a defendant for his *status*, *i.e.*, drug addiction. The Supreme Court made the distinction between a status and an act clear in *Powell v. Texas*, 392 U.S. 514, 20 L. Ed. 2d 1254, 88 S. Ct. 2145 (1968), where it rejected an eighth amendment challenge to a conviction of

public intoxication. The defendant in *Powell* argued that his chronic alcoholism rendered him incapable of controlling his actions. *Powell*, 392 U.S. at 517, 20 L. Ed. 2d at 1259, 88 S. Ct. at 2146-47. The Supreme Court reiterated that a state may not punish mere status, but upheld the defendant's conviction for an *act* of appearing drunk in public. *Powell*, 392 U.S. at 532-34, 20 L. Ed. 2d at 1267-69, 88 S. Ct. at 2154-55. Here, as in *Powell*, the insanity statue punishes the crime of murder, but does not make it a crime to be insane or, for that matter, homicidal if in fact no homicide is committed. While Illinois may impose a higher burden on a defendant to prove insanity than do many other states, that does not translate into criminalizing mental illness. See *Freeman*, 804 F.2d at 1577 (rejecting the eighth amendment challenge to the clear and convincing standard of proof under the Insanity Defense Reform Act).[10]

## Equal Protection Challenge

■ Defendant contends that the insanity statute violates the equal protection clauses of the United States and Illinois Constitutions because it treats mentally ill defendants more harshly than involuntarily intoxicated defendants. Under the amended version of the insanity statute, a person is not criminally responsible if, at the time of the offense and as a result of a mental disease or defect, he "lack[ed] substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6—2(a) (West 2000). In contrast, a person who was in an intoxicated or drugged condition is not criminally responsible for his conduct if his condition was involuntarily produced and deprived him of "substantial capacity either to appreciate the criminality of his conduct *or to conform his conduct to the requirements of law.*" (Emphasis added.) 720 ILCS 5/6—3(b) (West 2000). Defendant objects to his inability to argue, as part of his insanity defense, that he should not be held criminally responsible for his conduct because he could not control his actions.

Defendant concedes that the statute does not create a "suspect" classification, such as one based on race, gender or national origin, and, therefore, a rational basis test applies. As discussed, under this test, which is the same under both the federal and Illinois Constitutions (*Vernon*, 276 Ill. App. 3d at 389, 657 N.E.2d at 1120):

> "[O]ur review is limited and deferential; a statutory classification will be upheld if it bears a rational relationship to a legitimate state interest. [Citation.] If we can reasonably conceive of any set

---

[10]Defendant cites no on-point authority in support of the proposition that the Illinois Constitution offers broader protections than the eighth amendment.

of facts to justify the statutory classification, we will uphold the statute." *Teran*, 353 Ill. App. 3d at 733, 818 N.E.2d at 1289.

An equal protection challenge to the insanity statute has been addressed in general terms by our district in *Vernon*. An issue identical to the one raised by defendant on this appeal has been addressed by the Second District in *Teran*. Both decisions rejected the equal protection challenge to the insanity statute. See *Vernon*, 276 Ill. App. 3d at 390, 657 N.E.2d at 1121; *Teran*, 353 Ill. App. 3d at 734, 818 N.E.2d at 1290 (as compared to the intoxication statute). As we stated in *Vernon*:

> "In enacting the change to Illinois' insanity law, it is clear that the General Assembly acted out of concern that the insanity defense had become too easy to raise and too difficult to disprove. Prior to the change in the law, once defendant offered any evidence of insanity, the State had to shoulder the burden of proving defendant's sanity beyond a reasonable doubt. In the early 1980s, however, there was widespread criticism of the defense and fear that violent offenders could easily thwart justice by fabricating an insanity claim. In addition, as defendant concedes, part of the General Assembly's motivation may have been a concern that those committed to psychiatric care after successfully raising an insanity defense could be released into society to again commit criminal acts. One State representative who spoke before the General Assembly in support of the legislation noted that the statute would also help prevent tragedies such as that reported in a Newsweek magazine story wherein a defendant successfully raised the insanity defense and later escaped psychiatric confinement. While at large he committed several gruesome murders. 83d Ill. Gen. Assem., House Proceedings, June 21, 1983, at 136 (Comments of Representative Johnson); J. Alter, *Nightmare in California*, Newsweek, June 20, 1983.
>
> Defendant responds that such 'precautionary measures *** were more appropriate in a day before the advent of psychiatric medication' and 'before modern-day advances in the identification and treatment of mental illness.' Even so, it is not the function of this court to decide which approaches to public safety issues are 'more appropriate,' so long as the legislation at issue embodies a rational approach to a perceived problem. Representative Johnson stated on the floor of the House that the changes now at issue were 'a modest and reasonable step towards *** putting an out of control defense in some sort of meaningful control.' [Citation.] The legislation passed by an overwhelming vote. We will not substitute our judgment for that of the General Assembly." *Vernon*, 276 Ill. App. 3d at 390, 657 N.E.2d at 1121.

In *Teran,* the Second District agreed with *Vernon* that the legislature had a rational basis for amending the definition of insanity. The court in *Teran* further held that the legislature acted rationally in removing from the insanity statute the prong allowing for a defense based on the defendant's inability to " 'conform his conduct to the requirements of law,' " while retaining it in the intoxication statute. *Teran,* 353 Ill. App. 3d at 734, 818 N.E.2d at 1290. The court noted that the legislature "has no duty to amend its compilation of statutes when it decides to strike language in one statute simply because the same language is contained in another enactment," and the defendants asserting the insanity defense are not similarly situated to those asserting the intoxication defense.[11] *Teran,* 353 Ill. App. 3d at 734, 818 N.E.2d at 1290. We agree with *Vernon* and *Teran* that the equal protection challenge to the insanity statute fails.

## Fitness Finding

■ Defendant contends that the State failed to prove that he was fit to stand trial because the State failed to establish that he had the ability to assist in his defense.

It is well established that " 'the criminal trial of an incompetent defendant violates due process.' " *Cooper,* 517 U.S. at 354, 134 L. Ed. 2d at 506, 116 S. Ct. at 1376, quoting *Medina,* 505 U.S. at 453, 120 L. Ed. 2d at 368, 112 S. Ct. at 2581; accord *People v. Haynes,* 174 Ill. 2d 204, 226, 673 N.E.2d 318, 328 (1996). The federal constitutional test for incompetence is also well-settled.

> "A defendant may not be put to trial unless he ' "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him." ' " *Cooper,* 517 U.S. at 354, 134 L. Ed. 2d at 506, 116 S. Ct. at 1377, quoting *Dusky v. United States,* 362 U.S. 402, 402, 4 L. Ed. 2d 824, 825, 80 S. Ct. 788, 789 (1960).

Under Illinois law:

> "A defendant is presumed to be fit to stand trial or to plead ***. A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104—10 (West 2000).

---

[11]The court in *Teran* explained that the defendants asserting the insanity defense are not similarly situated to those asserting the intoxication defense because the former rely on evidence of primarily subjective nature, which could be easily fabricated, while the latter rely on objective evidence such as blood tests. *Teran,* 353 Ill. App. 3d at 734, 818 N.E.2d at 1290.

Once a defendant properly raises a *bona fide* doubt as to his fitness to stand trial, the burden shifts to the State to prove the defendant's fitness by a preponderance of the evidence. 725 ILCS 5/104—11(c) (West 2000); *People v. Mahaffey*, 166 Ill. 2d 1, 18, 651 N.E.2d 1055, 1063 (1995). On appeal, we must determine whether the trial court's finding was against the manifest weight of the evidence. See *Mahaffey*, 166 Ill. 2d at 18, 651 N.E.2d at 1063.

Defendant relies on *People v. Henderson*, 83 Ill. App. 3d 854, 867, 404 N.E.2d 392, 402 (1980) ("To be found fit, defendant must be able to cooperate with his attorney to the extent that his defense may be conducted in a rational manner. [Citation.] In order to conduct a defense in a rational and reasonable manner, a defendant should be capable of cooperating with his counsel to the end that any available defenses may be interposed"), and *United States v. O'Kennard*, No. 02 CR 481 (N.D. Ill. 2004) ("Cooperation with counsel has been described as 'the capacity to provide whatever assistance counsel requires in order to explore and present an adequate defense' "), quoting R. Bonnie, *The Competence of Criminal Defendants: Beyond Dusky and Drope*, 47 U. Miami L. Rev. 539, 552-53 (1993).

Aside from these rather broad propositions, neither *Henderson* nor *O'Kennard*, which we note found the defendants fit, addressed in any detail the concept of adequate capability to cooperate with counsel. In this regard, the Illinois fitness statute is more specific. It provides that a trial court may consider the following factors during a fitness hearing in determining both the defendant's understanding of the nature of and purpose of the proceedings and his ability to assist counsel:

"(1) The defendant's knowledge and understanding of the charge, the proceedings, the consequences of a plea, judgment or sentence, and the functions of the participants in the trial process;

(2) *The defendant's ability to observe, recollect and relate occurrences, especially those concerning the incidents alleged, and to communicate with counsel*;

(3) The defendant's social behavior and abilities; orientation as to time and place; recognition of persons, places and things; and performance of motor processes." (Emphasis added.) 725 ILCS 5/104—16(b) (West 2000).

Ultimately, fitness must be judged based on the totality of the circumstances. See *People v. Kinkead*, 182 Ill. 2d 316, 340, 695 N.E.2d 1255, 1266 (1998); *State v. Forsyth*, 547 N.W.2d 833, 838 (Iowa App. 1996).

Here, the State's expert, Dr. Seltzberg, testified that defendant was able to understand the nature of the proceedings against him and

the roles of various individuals involved, and defendant was oriented as to time, place and persons. Defendant's expert, Dr. Obolsky, did not challenge and essentially concurred in that assessment. Defendant, however, urges that he was unfit to stand trial because he could not assist in his defense since he could not recollect and relate the events surrounding the deaths of Nicole and Jade. Defendant asserts that in light of the heavy burden on him to prove insanity by clear and convincing evidence, his ability to recollect and communicate his perception of those events to his counsel was especially important.

As noted, Dr. Obolsky testified that defendant "is an individual, who, on one particular topic his thinking is psychotic, and that is about the events of the crime" and that his answers were "bizarre" and "not rational." On the other hand, Dr. Seltzberg's testimony focused on defendant's lucidity and comprehension of the events pertaining to his trial and to his relationship with his counsel and the court, concluding that defendant fully understood the nature of the proceedings against him, was fully oriented as to time, place and persons, and had no difficulty in communicating with his counsel. Specifically, Dr. Seltzberg testified that defendant: knew that he was charged with double murder and remarked that he was facing the death penalty; understood the basic nature of the insanity defense; indicated that he understood the nature of direct and cross-examinations, that he had the right to testify, but was not required to do so, and the nature of plea bargaining; was able to tell his next court date and who was the presiding judge; was able to explain the roles of the assistant State's Attorney and his attorney; and expressed trust in his attorney and stated that he had no difficulty in communicating with her, noting that he could best help his attorney by telling her the truth. However, neither Dr. Seltzberg nor any other expert was presented to rebut Dr. Obolsky's opinion regarding defendant's recollection of the events surrounding the killings. Apparently, as a result, the trial court agreed with Dr. Obolsky in that respect, stating, however:

> "It strikes me that this particular psychosis is based on some delusion, and presents itself only as to this particular event, and nothing else."

As noted, the trial court did not consider that factor to be overridingly dispositive. In view of the well-supported conclusion of fitness presented in Dr. Seltzberg's testimony, we agree.

The narrow area of delusional thinking and recollection concerning the events surrounding the killings, where in all other pertinent areas defendant was found to be fit and well able to assist counsel in his defense, would seem no worse than an impediment resulting from

amnesia regarding the events of the crime, which has been held in Illinois, as well as other jurisdictions, not to foreclose a finding of fitness. See *People v. Schwartz*, 135 Ill. App. 3d 629, 639, 482 N.E.2d 104, 111 (1985) ("We believe \*\*\* that defendant was able to understand the nature and purpose of the proceeding against him and to assist in his defense, as contemplated under our statute, and his inability to recollect the events on the day of the offenses due to his amnesia does not, by itself, warrant a contrary conclusion. The trial court under this evidence correctly found defendant fit to stand trial"); accord *United States v. Hearst*, 412 F. Supp. 858 (D.C. Cal. 1975); *State v. Johnson*, 112 Ariz. 17, 536 P.2d 1035 (1975); *Darby v. State*, 514 N.E.2d 1049 (Ind. 1987); *State v. Emerson*, 375 N.W.2d 256 (Iowa 1985); J. Purver, Annotation, *Amnesia as Affecting Capacity to Commit Crime or Stand Trial*, 46 A.L.R.3d 544 (1972 & Supp. 2005) (while the defendant's ability to recall events so that he can furnish facts to his counsel is important, all of the cases in the annotation dealing with the capacity to stand trial have recognized that a defendant's amnesia does not *per se* render him incapable of standing trial).

Here, as in *Schwartz*, the trial court found defendant lucid and able to assist his counsel, despite his impaired recollection concerning the events surrounding the killings. Moreover, unlike an amnesiac, defendant here, according to Dr. Seltzberg, was in fact able to communicate the events of the immediate aftermath of the killings. In addition, unlike an amnesiac, whose recollection may well be a blank page, defendant here, according to Dr. Obolsky, was able to talk about the incident of the killings themselves, albeit delusionally, which for the purposes of interposing an insanity defense is more helpful than if defendant had no recollection at all. In that regard, we note that defendant's counsel had advised Dr. Obolsky that she did not think that defendant's nondisclosure to her of certain pertinent information would interfere with her ability to present a competent defense. "The representations of defendant's counsel concerning the competence of his client, while not conclusive, are another important factor to consider." *People v. Eddmonds*, 143 Ill. 2d 501, 518, 578 N.E.2d 952, 959 (1991); see also *O'Kennard*, No. 02 CR 481 ("[t]his court has also considered defense counsel's observations"). We also note that although it appears that, for reasons which may have been delusional, defendant refused to communicate the name of a potential alibi witness to his counsel, such nondisclosure, again, is no worse than a nondisclosure by a defendant who had amnesia and could not remember the witness. Of course, if the nondisclosure of such witness was reality-based rather than delusional, it would not have been reflective of impaired fitness insofar as it was based on rational consider-

ations. See *Haynes*, 174 Ill. 2d at 231-32, 673 N.E.2d at 331 (upholding the trial court's finding of fitness in reliance on an expert opinion that defendant's decision not to cooperate with counsel and represent himself was not a product of a delusion). Notwithstanding any delusional thoughts or recollections, defendant, as Dr. Seltzberg expressed in her testimony, was fully aware of the charges against him and all other pertinent respects of the criminal proceedings which would determine his guilt or innocence—including the roles of his counsel, the prosecutor, and the judge. And defendant expressed trust in his counsel and willingness to cooperate with her.

Thus, defendant's lack of clarity and lucidity with respect to historical events was merely one of the factors for the trial court to consider, as was the nondisclosure of a potential alibi witness. The other factors, as noted, amply favored the finding of fitness. Although Dr. Obolsky found defendant's psychotic thinking regarding the historical events to be an overriding consideration in his opinion that defendant was unfit, the trial court did not have to accept that conclusion. See *Haynes*, 174 Ill. 2d at 231-32, 673 N.E.2d at 331 (it was up to the trial judge to decide how much weight to give to each expert's testimony, and the judge was not required to accept the defense expert's view); accord *Mahaffey*, 166 Ill. 2d at 18, 651 N.E.2d at 1064; *People v. Coleman*, 168 Ill. 2d 509, 525, 660 N.E.2d 919, 928 (1995) (the ultimate issue of the defendant's fitness is for the trial court, not the experts, to decide). We note that Dr. Seltzberg's evaluation of defendant was as thorough and based on substantially the same data as Dr. Obolsky's. She found defendant fit to stand trial, and the trial court gave her opinion a greater weight. We cannot say that the trial court's decision was against the manifest weight of the evidence.

### Failure to Prove Insanity

■ Defendant contends that the trial court erred in rejecting his insanity defense. As discussed, defendant was required to prove his insanity by clear and convincing evidence. We will reverse the trial court if its determination is against the manifest weight of the evidence. See *People v. McDonald*, 329 Ill. App. 3d 938, 946, 769 N.E.2d 1008, 1015 (2002).

In support of his contention, defendant cites to *People v. Wilhoite*, 228 Ill. App. 3d 12, 592 N.E.2d 48 (1991), *People v. Garcia*, 156 Ill. App. 3d 417, 509 N.E.2d 600 (1987), and *People v. Arndt*, 86 Ill. App. 3d 744, 408 N.E.2d 757 (1980)—all reversing the trial court's finding of sanity. In *Wilhoite*, of the four psychiatrists who had examined the defendant, three opined that she was insane at the time of the offense. The fourth psychiatrist opined that the defendant was sane and her

conduct was a result of voluntary cannabis intoxication. *Wilhoite*, 228 Ill. App. 3d at 15-19, 592 N.E.2d at 50-52. The record showed that the dissenting psychiatrist never asked the defendant nor otherwise attempted to ascertain how much marijuana she smoked on the night of the incident or at any previous time. We noted that without such knowledge the psychiatrist's opinion would necessarily have depended entirely upon the inferences drawn from the defendant's behavioral symptoms. The defendant's symptoms, however, were not consistent with the symptoms of cannabis intoxication listed in the Diagnostic and Statistical Manual of Mental Disorders, upon which all experts relied. Consequently, we found the dissenting expert opinion attributing the defendant's conduct to cannabis intoxication untenable. *Wilhoite*, 228 Ill. App. 3d at 21-23, 592 N.E.2d at 54-55. In this regard, we explained:

> "The weight to be given an expert's opinion on sanity is measured by the reasons given for the conclusion and the factual details supporting it. [Citations.] The opinion of an expert is of value only when it is based upon and in harmony with facts which are capable of verification by the court. [Citation.] The trier of fact may accept one expert's testimony over that of another, but the witness must be credible in his diagnosis. [Citations.]
>
> If the expert's opinion is without proper foundation, particularly where he fails to take into consideration an essential factor, that opinion 'is of no weight, and must be disregarded.' [Citation.]" *Wilhoite*, 228 Ill. App. 3d at 20-21, 592 N.E.2d at 53-54.

Defendant here cannot make such a claim. As noted, Dr. Obolsky opined that defendant was insane at the time of the killings, while Drs. Seltzberg and Henry were unable to form an opinion regarding defendant's sanity, in significant part because of the lack of sufficient information upon which to base an opinion. If anything, this underscores the foundational weakness of Dr. Obolsky's opinion. Given this foundational weakness, we cannot say that the trial court erred in finding that defendant failed to prove insanity by clear and convincing evidence.

Defendant's reliance on *Garcia* and *Arndt* is similarly misplaced.[12] In both cases, the expert witnesses were in agreement regarding the defendant's insanity and it did not appear that the trial court questioned their credibility. See *Garcia*, 156 Ill. App. 3d at 424, 509 N.E.2d at 604; *Arndt*, 86 Ill. App. 3d at 747-48, 408 N.E.2d at 759-60.

---

[12]We note that both cases were controlled by the earlier law that treated sanity as an element of the offense to be proven by the State beyond a reasonable doubt. See *Garcia*, 156 Ill. App. 3d at 424, 509 N.E.2d at 604; *Arndt*, 86 Ill. App. 3d at 749, 408 N.E.2d at 760.

As discussed, such is not the case here where there was lack of unanimity among the experts. It is apparent from the record of the proceedings that the trial court acted properly in weighing the conflicting evidence and determining whether defendant met his burden of proof. The court determined that defendant failed to carry his burden. After carefully reviewing the record, we cannot say that the trial court's determination was against the manifest weight of the evidence.

For the reasons set forth above, we affirm the judgment of the trial court.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.